## UNITED STATES v. BARKER.

Circuit Court of Appeals, Ninth Circuit.
December 13, 1929.

No. 5908.

Anthony Savage, U. S. Atty., and Tom De Wolfe, Asst. U. S. Atty., both of Seattle, Wash., John T. McCutcheon, Asst. U. S. Atty., of Tacoma, Wash., and Lester E. Pope, Regional Atty., U. S. Veterans' Bureau, of Seattle, Wash.

Robert B. Abel, of Tacoma, Wash., and Donald G. Abel, of Chehalis, Wash., for appellee.

Before RUDKIN, DIETRICH, and WILBUR, Circuit Judges.

DIETRICH, Circuit Judge. On December 1, 1917, while he was in the Navy, the appellee applied for and obtained war risk insurance in the amount of $10,000. For nonpayment of premium the policy lapsed, and was no longer in force after August 31, 1918. On October 18, 1920, he made application for a reinstatement to the amount only of $3,000, and this application was approved December 8, 1920.

Ignoring entirely the reinstatement proceedings, he brought this suit upon the original $10,000 policy, and alleged that he became totally and permanently disabled during the period it was in force. By its answer defendant put in issue this averment, and set up the reinstatement proceedings as an affirmative defense. The cause was tried with a jury, resulting in a verdict for the full amount, and appropriate judgment was entered thereon, from which the defendant prosecutes this appeal.

■ The application for reinstatement and its approval, as above stated, being conceded, the case in that aspect we think falls within the principle of the four cases decided by us on July 1, 1929,[1] more particularly United States v. Allen, 33 F.(2d) 888. We find no substantial distinction between this and the

[1] United States v. Buzard, 33 F.(2d) 883, United States v. Kusnierz, 33 F.(2d) 887, United States v. Cross, Id., and United States v. Allen, 33 F.(2d) 888.

Allen Case, but appellee urges as a consideration not brought to our attention there a statute of the state of Washington, where the action was instituted, providing that:

"No oral or written misrepresentation or warranty made in the negotiation of a contract or policy of insurance, by the assured or in his behalf, shall be deemed material or defeat or avoid the policy or prevent it attaching, unless such misrepresentation or warranty is made with the intent to deceive. Rem. Comp. Stat. Wash. 1922, § 7078."

The validity of the contract is not thought to be subject to state laws, but, if it were otherwise, we are unable to see how this section could be of aid to the plaintiff. The government does not contend that he ever made any misrepresentations to procure the original policy or the reinstatement. If it were challenging the validity of the reinstatement, and the contract evidenced thereby were subject to state laws, then plaintiff might invoke the statute, but, instead of challenging, the government asserts, the validity of the reinstatement.

■ The government also contends that, apart from this consideration, the evidence did not warrant a submission of the cause to the jury. It appears that while he was in the Navy plaintiff suffered an infection beginning with the inner ear and spreading therefrom. For this malady a surgical operation, referred to as "a simple mastoid," was performed on March 4, 1918. Partial paralysis of one side of the face ensued, but that soon cleared up. Without going into details, we assume, in harmony with plaintiff's contention, that the operation was not wholly effective to relieve him from the malady. He was discharged from the Navy on July 9th, and shortly thereafter had a "dizzy or fainting spell."

Upon his discharge he at once went to Tacoma, where he had relatives. He was employed in a garage from July 28 to September 15, 1918, and then went to work as a car checker or yard clerk for the Northern Pacific Railway Company—about October 10th of that year. In this employment he continued until November 5, 1919. He himself did not remember any particular day off during that period, and the records of the railway company show that he received full pay for almost every day—he being off a few days and working overtime upon some other days. During the period he suffered more or less from headache, nervousness, and dizziness, attributable, according to the medical testimony, to a continuation of mastoid infection and the gathering of pus as a result thereof.

He decided to have another operation, and for that purpose "took time off" from his railroad employment on November 5, 1919. What is called a "radical mastoid" was performed nine days later. A measure of relief was thus obtained, but ultimately the operation resulted in a partial paralysis of one side of his face, seemingly permanent. He returned to his employment with the railroad company on January 3, 1920, and worked up to and including the 7th of February of that year. He was then off until April 6th, and from that time on to October 5th he worked almost continuously. He then quit to take up vocational training under direction of the Veterans'. Bureau, and he entered upon that course a few days later. He stayed in vocational training from October 11, 1920, to December 20, 1923, when he was discharged. During this time, in addition to being provided·with books and other requisite incidentals, he was paid a part of the time at the rate of $135 per month and at other times at the rate of $145 a month. As a part of his training he was assigned to various tasks with business or professional firms, for which he got no additional compensation. After the second operation, he was also receiving compensation from the Veterans' Bureau, but at what rate does not clearly appear. While engaged, in course of this training, in a job of bookkeeping for a firm at Chehalis, on March 28, 1921, he wrote to the General Board of Vocational Training that he was getting along well and was "feeling fine." Upon the termination of the training, on December 20, 1923, he was unable to get work for a while, and he testified that he felt sick much of the time, but was no worse than he had been. In the meantime, it will be remembered, he certified in his application for insurance reinstatement made October 16, 1920, that he was then "in good health."

In the same capacity as before he again went to work for the railroad company on August 4, 1924, at which time he certified to the company that he had no physical defects that would render him unfit for service. At the trial he called as one of his medical witnesses a Dr. Kunz who, upon cross-examination, conceded that on July 22, 1924, he had in writing certified that upon examination of the plaintiff he found "that he is in good physical condition and free from disease of any kind." This certificate the plaintiff furnished to the railroad company. At that time and for the same purpose he submitted to an examination by a Dr. Remington, who testified that he found paralysis of the right side of the face, a noticeably flat chest, and a slight curvature of the spine, but nothing which, in his opinion, "would in any way interfere with his work as a clerk" for the railroad company. From August 4, 1924, he thus worked for the company to February 12, 1927. Apparently he was an extra ·clerk or car checker, and some months he was actually employed but a few days and some months approximately full time; altogether possibly averaging about 20 days a month. He testified that he quit because he could· not get along with his "boss."· The facts thus stated either appear from plaintiff's own testimony or are uncontroverted.

There was medical testimony given by physicians called as witnesses for the plaintiff and others called as witnesses for the defendant, in the main not highly conflicting. For the purposes of this decision it is to be conceded that, starting with the original infection of the inner ear while plaintiff was in the service, and as a consequence thereof he has suffered more or less from time to time with headache, nausea, and dizziness, and has had some fainting spells, there is a partial paralysis of one side of his face resulting from the second operation, and that the hearing of one ear is seriously impaired. Putting it another way, it may be conceded that the evidence shows that at the time the original policy lapsed he was not free from the infirmity for which he had the first surgical operation, and that he has never fully recovered therefrom, and that as a consequence he has always been under a measure of disability, and to some extent the disability will be permanent. But upon the conceded facts we think it must be held as a matter of law that such disability was not at the time the policy lapsed, if ever, a total disability. While some of the medical witnesses expressed the opinion that the infirmity was, at least in part, permanent, no one of them ventured to say that the disability was total. On the other hand, Dr. Johnson, one of the physicians called as a witness by the plaintiff, after explaining that he had treated him from time to time beginning in 1920, and had last examined him on April 1, 1929, at which later date he found pus in the ear, testified:

"These conditions clear up at times. I would consider it a thing that would be very apt to require years, probably, to clean up, and it might be dried up at times. And then there might be a period of several months or several years before he would be bothered with it again. There is nothing definite about that. At the time I examined this man in 1920 he was working as a clerk at the Northern Pacific Railroad. There was nothing in

the condition which I found at that time which would preclude him from following continuously a clerical occupation. There was nothing in the condition which I found at that time which would prevent him, in my opinion, from following continuously many gainful occupations. When I examined him in 1920 and in 1922 he was then in vocational training. I recommended that he was feasible for training, and for conditions in vocational training. At the time of these examinations I made, March 4, 1921, Sept. 15, 1921, Jan. 12, 1922, Feb. 8, 1922 and July 11, 1922, there was nothing in the conditions which I found which would, in my opinion, have precluded this man from following continuously a clerical occupation. There was nothing in the condition which I found at these examinations which, in my opinion would have prevented him from continuously following many substantially gainful occupations. As far as that ear is concerned he could still do several things."

And Dr. Wheeler who was also called as a witness for plaintiff and who explained that he performed the second surgical operation, testified:

"After the operation the man left the hospital, at the end of two weeks, according to the hospital records. He was then in good physical condition except for the facial paralysis. I don't know just how long it took for the ear to become a dry ear but the operation was very successful as far as eliminating the suppuration. I don't remember how long I had him under observation. I have seen him occasionally around town, but I just remember him, that's all. The ear may not have been absolutely dry the day he left the hospital, but when he left my care he had no running ear. At the time he left my care there was not, as I remember, anything in his condition at that time as I found it, which would have precluded him from following continuously many substantially gainful occupations. Of course, the time he left my care he was recently out of the hospital and a man after an operation of this kind takes a little time to get his strength. But I remember no condition which would interfere with his working."

From the facts shown, to hold total disability would be to do violence to any common or reasonable understanding of the meaning of these terms. Not without hesitation we sustained the right of plaintiff to recover in the Sligh Case (C. C. A.) 31 F.(2d) 735, but to go further and yield to the contention of the plaintiff here would be to ignore one of the material limitations of the policy.

We therefore feel constrained to reverse the judgment, with directions to take further proceedings not out of harmony with the views herein expressed.