## UNITED STATES v. LAWSON.
### No. 6261.

Circuit Court of Appeals, Ninth Circuit.
May 18, 1931.

H. E. Ray, U. S. Atty., and Ralph R. Breshears, Sam S. Griffin, and W. H. Langroise, Asst. U. S. Attys., all of Boise, Idaho.

Oscar W. Worthwine and Jess B. Hawley, both of Boise, Idaho, and R. W. Katerndahl, of Salt Lake City, Utah, for appellee.

Before RUDKIN, WILBUR, and SAWTELLE, Circuit Judges.

SAWTELLE, Circuit Judge.

This is an appeal from a judgment in favor of plaintiff, in an action upon a contract of war risk insurance.

The errors complained of by appellant are to the admission in evidence of a regulation defining total and permanent disability, promulgated by the Bureau of War Risk Insurance by virtue of authority conferred by the War Risk Insurance Act; the failure of the trial court to give one of defendant's requested instructions; and the refusal of the court to grant defendant's motion for a directed verdict, made at the close of plaintiff's evidence, and renewed at the close of all the evidence, and substantially upon the same grounds.

Spencer H. Lawson, the insured, enlisted in the military service of the United States on August 4, 1918, and went overseas on October 28, 1918. He arrived in the United States on his return October 6, 1919, and was honorably discharged at Camp Dodge, Iowa, on October 20, 1919. His contract of war risk insurance lapsed November 30, 1919, at midnight. Plaintiff, when he enlisted, was 21 years old. The evidence tended to show that prior to his enlistment he had worked as a farmer for a period of 8 years, never having had any difficulty on account of his health in plowing ground, hauling wood, stacking grain, milking cows, and performing the general duties of a farmer on the average farm, and he had taken part in usual youthful athletic activities. His enlistment record showed him to be 5 feet 5½ inches in height, and his weight 139 pounds. From a record of general physical examination at place of mobilization, it appeared that his head, eyes and vision, ears and hearing, chest and extremities, were "normal," and that there were no deformities, except that under the head of "remarks" appeared the statement, "Remnants of old facial paralysis on right side, no trouble present." From army hospital records it appeared that plaintiff, on or about December 27, 1918, had a case of "mumps, bilateral," which lasted until on or about January 22, 1919; and the evidence tended to show that, previous to being taken to the hospital, plaintiff had been sick about 24 hours, the men having been doing 48-hour shifts. From the army records it further appeared that from March 4 to March 7, 1919, he was again under hospital treatment, the diagnosis being "glossitis" and "mumps, bilateral"; and that he was again admitted to the hospital, at Brest on August 21, 1919, the evidence tending to show that he had on a 3-day trip from Germany to Brest, in a bunk car carrying from 80 to 85 men, developed a sore throat with swollen tongue, and that he was feeling "hot all over," and that, on detraining at Brest, after he had "stood around eight or nine hours," he was "tagged" and sent to the hospital, where, it appeared from the army records, he was under treatment from August 21 to October 1, 1919, when he was assigned to duty, the final diagnosis being "scarlet fever."

At the time of his discharge, plaintiff signed a declaration wherein, in response to the question whether he had any reason to believe that at the present time he was suffering from the effects of any wound, injury, or disease, or had any disability or impairment of health, he answered "No." In a "Certificate of Immediate Commanding Officer," which was at that time signed by the captain commanding, at Camp Dodge, Iowa, the body of such certificate—containing statements, with blanks to be filled in, as to whether or not the officer had reason to believe that the soldier signing the foregoing declaration had then a wound, injury, or disease, whether or not incurred in the military service of the United States—was stricken out, and the certificate did not contain any statement on the above or any other subject. In another certificate, the surgeon who examined plaintiff at the time of his discharge certified that he had been given a careful physical examination, and that "In view of occupation he is—0—per cent. disabled."

The evidence further tended to show that, after plaintiff's discharge, he went directly from Camp Dodge to his home at Spencer, Idaho, arriving there about October 22, 1919; that, when he arrived home, he was weighing between 105 and 110 pounds, was troubled with a cough (which he had before his discharge), and suffered from lack of sleep on account of his aching joints; he at

that time aching all over, and his back seeming to bother him more than other parts. It made him tired when he tried to carry a bucket of coal or milk a cow. His heart troubled him when he walked down town, about three blocks; he choked and got weak. Every afternoon he lay down on the lounge. As observed by witnesses who had know him and been familiar with his physical condition for a considerable period of time prior to his enlistment and who saw him after his return, he was very thin and was very much run down, was weak, nervous, and reticent, and there was a decided difference for the worse in his general condition of health. Ever since his discharge he has had a pain in his back, and has had pain continuously.

For about 6 months after his return, plaintiff rested, but in the spring of 1920, being unable to continue farming, and because he "had to do something," he, feeling a little stronger, on May 15 secured employment with the Forest Service as temporary forest ranger. Immediately following this, he was employed by the Forest Service during the summer in telephone maintenance work. Upon concluding this work, he laid off for 6 months, but again went to work, in the spring of 1921, as a forest ranger, continuing as such until the summer of 1923, when, on account of his condition, he was transferred to the office of the Forest Service at Mackay, Idaho. In the spring of 1924 he was discharged from his clerical position at Mackay because of his inability to handle or lift implements around the office. In the latter part of September, 1924, plaintiff became postmaster at Spencer, Idaho, a position which he held at the time of the trial. The employment records of the Forestry Department, introduced in evidence, tended to show that plaintiff was appointed temporary forest ranger on May 15, 1920, at a salary of $1,100 per annum, plus a bonus of $240 a year, this service terminating June 30, 1920, immediately following which he was employed on a temporary basis in connection with telephone maintenance work during the summer of 1920. On April 1, 1921, he was given a probatory appointment as forest ranger at a salary of $1,220 per year, plus an annual bonus of $240, serving in this capacity until August 31, 1923. On September 1, 1923, he was appointed a forest clerk at a basis salary of $1,100 per year, in which capacity he served until April 15, 1924. The duties of postmaster at Spencer were assumed by plaintiff in the latter part of September, 1924; his annual pay being $1,100. The evidence tended to show that plaintiff

had paid out close to $1,400 since he had been postmaster, over and above any amount the government allowed him for separating allowance, for hire of substitutes during plaintiff's absence from the post office, while he was visiting hospitals and taking treatments.

While plaintiff was engaged in telephone maintenance work, he had to get off his horse every 15 or 20 minutes and either rest or walk. While he was a forest ranger he, on account of the pain it caused him to ride, used an automobile, except in one district where he had to use a horse. He had difficulty in riding, and rode with his right foot out of the stirrup, which permitted him to ride on the right side of the saddle, on the muscles of his leg. Owing to the difficulty he had in saddling a horse, he arranged at the ranger station a rope which was hung over a beam and which held the saddle suspended so that by untying the rope he could drop the saddle on the back of the horse. He would make camp at some ranch or sheep camp, where he had assistance in saddling his horse when he left. Instead of marking trees himself, requiring the swinging of an axe, he had the purchaser mark them. In 1921, while a forest ranger, he tried to plow in doing some road and trail work, but found he was unable to do the jerking and side motions required to throw the plow out of the furrow. Plaintiff bought in 1921 a belt nine inches wide, and wore it under his trousers as a support for his back; in 1922 he purchased a body brace extending from the small of his back up to his shoulders, and, in 1925 or 1926, a corset-like brace extending down over the hips and up under the armpits; and continuously since 1921 he has worn one or the other of said supports. During the winter of 1922, obtaining permission to do so from the Forest Service, plaintiff removed his headquarters to Windspur, Idaho, because of the difficulty he had in making the trip between the station to which he had been assigned and the post office at Windspur, 15 miles distant, to get his mail. He stayed at Windspur until the road opened up so that he could use his car to get back to the station, where, upon his return, he remained until he went to Mackay. As observed by a witness who saw plaintiff get out of his car at the station, and at gas stations at Dubois and at Spencer, Idaho, in 1921, 1922, and 1923, and since then it was quite an effort for plaintiff to get out and move around; "he acted like a man who had the lumbago—broken down in the back; always putting his hand on his hip or back," and "he walked

away from the car like he had a kink in his back. * * * That condition has continued up to the present time." In 1921 plaintiff still had a cough, but it seemed to be relieved a little, but during all the year 1922 and part of the year 1923 he had a violent cough, and he has had a cough ever since. After plaintiff's return from the Army, he suffered continually from lack of sleep, it being necessary to lie on his back or left side on account of the pain in his back, this condition not having changed, but having continued since his discharge. At night his mother, seeing a light on, went frequently into his room to try to make him comfortable and ease his pain, and his father, when he was alive, did the same. The evidence further tended to show that plaintiff has never had a full night's sleep since his return from the Army, on account of the pain in his back, and this condition has continued since his discharge. He has not had any appetite from the time of his discharge to the present time. While he has been postmaster at Spencer, plaintiff's mother and sister have had to assist him in lifting mail sacks and packages, and others have, because of his inability, assisted him in such work and in delivering mail at the post office and sending out parcel post mail. Somebody else had to cut the kindling for the post office stove and take the ashes out. In winter, when the snow was deep, plaintiff's father, when he was alive, would break trail for plaintiff, and, after his father's death, his mother would break trail for him.

The evidence further tended to show that plaintiff made numerous efforts, commencing in 1921 and continuing up to the time of the trial, to obtain relief from his ailments, by consulting and taking treatments from a number of osteopathic and other physicians, and by visits to and treatments at various United States veterans' hospitals in Idaho, Utah, Washington, and California, and by self-administered treatments consisting of hot mineral baths and of steam-cabinet baths, the latter being used by plaintiff, for the purpose of obtaining temporary relief from pain, during the entire period between plaintiff's return home from the Army and the trial of the action. The record contains the testimony of five physicians. Two of these, Dr. Junkin and Dr. Newton, called on behalf of plaintiff, testified as to findings made and conclusions reached from examinations of plaintiff made in 1922, 1927, 1929, and 1930; the examination of 1930 being made by Dr. Newton in March, some 2 weeks before the trial, and the prior examinations be-

ing made by Dr. Junkin. The three other physicians, called to testify on behalf of defendant, were Dr. Swackhamer, Dr. Crouch, and Dr. Ensign. These physicians, located at various United States veterans' hospitals, had in July, 1923, and December, 1924, made the respective examinations of plaintiff concerning which they testified. All of these witnesses, from the findings made by them as the result of their examinations, testified as to the conclusions reached and the opinions entertained by them, respectively, upon the question at issue as to whether or not the plaintiff was totally and permanently disabled at the date of his discharge from the army on October 20, 1919.

The evidence tended to show that, following some 25 or 30 treatments of plaintiff by Dr. Young, an osteopathic physician of Dubois, Idaho, in 1921 and the spring of 1922, an examination of plaintiff was made, at his instance, by Dr. Junkin, one of the above-named physicians called on plaintiff's behalf. This examination was made on August 18, 1922, without the taking of X-ray pictures. Dr. Junkin, in his deposition taken in March, 1930, at Idaho Falls, Idaho, stating that his testimony was principally from memory, but that he had examined plaintiff repeatedly, testified:

"I first treated the plaintiff Spencer H. Lawson August 18, 1922, and found him at that time to be suffering from active pulmonary tuberculosis, chronic tonsilitis and chronic infection of the spine. Since 1922 from my records, I have treated the plaintiff, Mr. Lawson, on January 3, 1923, February 4, 1923, December 16, 1924, and May 8, 1925, and other occasions of which I have no record.

"When I first treated Mr. Lawson in 1922 he was thin, emaciated, had a chronic cough and was anæmic. I have observed Mr. Lawson at other times than the specified dates mentioned and have observed that he was growing progressively more helpless. He was anæmic looking and had a sallow complexion. In my opinion during the past eight years Mr. Lawson has been suffering with tuberculosis. The pulmonary phase of the tuberculosis was very active in 1922 when I first saw him and has slowly gone into the fibrosed state. The condition of the spine has remained active and progressive. The infection of the spine has been a chronic one; there has been a question in my mind as to whether it was tubercular or not, but as the progress of the disease continues I am now of the opinion that the condition of the spine

is of a tubercular nature, and has been from the beginning of his trouble."

At the close of Dr. Junkin's direct examination, a hypothetical question was put to him, in which there were stated, in substance, as assumptions, the fact previously referred to herein as tending to be shown by the evidence, touching plaintiff's enlistment and service and his treatment in army hospitals overseas, including hospitalization of 6 weeks for scarlet fever; his discharge and return to his home; his inability to work for a period of 6 months after his return; his failure to regain the weight he had before his attack of scarlet fever, and his impaired appetite; his pains in the back since his discharge, his feeling of weakness, his impaired sleep, and having to sleep on his back or left side; and the finding of the witness himself, from his examination of August 18, 1922, that plaintiff was suffering from tuberculosis. Said hypothetical question also assumed the definition of total and permanent disability promulgated in a regulation of the Bureau of War Risk Insurance which was made by virtue of authority conferred in section 13 of the War Risk Insurance Act (as added by Act Oct. 6, 1917, § 2, 40 Stat. 399, as amended by Act May 20, 1918, § 1, 40 Stat. 555); said definition being as follows: "Total disability is that condition of mind or body which makes it impossible for the disabled person to follow continuously any substantially gainful occupation. Total disability shall be deemed to be permanent when it is founded upon conditions which make it reasonably certain that it will continue throughout the life of the person suffering from it."

Dr. Junkin, thereupon being asked to state whether or not, in his opinion, plaintiff was totally and permanently disabled, within the above definition of those words, at the date of his discharge from the United States Army on October 20, 1919, answered in substance that in his (Dr. Junkin's) opinion the plaintiff was so disabled; the witness thereupon further testifying that what plaintiff was suffering from, at the date of his discharge, that caused him, in the opinion of the witness, to be totally and permanently disabled, was from "sequela of scarlet fever."

Dr. A. M. Newton testified inter alia that "this case of osteomalacia, from which plaintiff is suffering, was of comparatively long standing origin" and that "the recognized treatment for this disease is rest and hygienic measures; proper dieting and balanced diet, and the administration of cal-

cium and phosphate methodically. There is no known cure for the trouble. The prognosis or outlook is unfavorable; he will either die of the disease or some intercurrent infection. He will not live to the normal period of expectancy. It is my opinion that Mr. Lawson is totally disabled, within the definition of permanent and total disability, being that condition of mind or body which renders it impossible for the disabled person to follow continuously any substantially gainful occupation, and permanent disability being defined as being a condition which is founded upon conditions which render it reasonably certain that it will continue throughout the life of the person suffering from it. I do not think he has a capacity for any labor that he can legitimately exercise, with regard to the preservation of life and health."

Dr. Newton at this point in his direct examination was asked a hypothetical question, which assumed the existence of certain facts that the evidence previously introduced by plaintiff tended to show, and also assumed total and permanent disability to be as defined in the regulation hereinbefore referred to. Upon the basis of such assumed facts, and of said definition, Dr. Newton was asked to "state whether or not in your opinion Mr. Lawson was permanently and totally disabled at the date of his discharge from the army, on the 20th of October, 1919?"

Answering said hypothetical question Dr. Newton testified: "My opinion is that he was totally disabled at that time. I think time will prove that it is a permanent disability also"; and "it was at that time."

The testimony of the physicians called by the government tended to prove that plaintiff was not totally and permanently disabled, and that he could have followed continuously a substantially gainful occupation without impairment to his health. There was other evidence introduced by the government tending to show plaintiff's employment by the Forestry Service and as postmaster at Spencer, Idaho, during the greater portion of the time from the date of his discharge from the Army to the date of trial. This lengthy statement of the plaintiff's evidence is made only because of the earnest contention of counsel for the government that the evidence is not sufficient to support the verdict, and that the court erred in not granting defendant's motion of a directed verdict in its favor. The only real issue involved in the trial of the case was whether the evidence was sufficient to establish total and permanent disability while the policy of the insured

was in full force and effect. That it was incumbent on the plaintiff to establish that he was totally and permanently disabled on or before the date the policy expired is beyond question. United States v. McPhee, 31 F. (2d) 243 (C. C. A. 9).

Considering all the evidence, it is manifest that the court did not err in submitting the question of the plaintiff's total and permanent disability to the jury. Undoubtedly there are cases arising under the War Risk Insurance Act where the trial court would not be warranted in submitting that question to the jury. In the case of United States v. Rice, 47 F.(2d) 749, this court reversed the ruling of the trial court, holding that there was total failure of proof on the question of total and permanent disability. In the case of United States v. Barker, 36 F. (2d) 556, this court said: "From the facts shown, to hold total disability would be to do violence to any common or reasonable understanding of the meaning of these terms. Not without hesitation we sustained the right of plaintiff to recover in the Sligh Case (C. C. A.) 31 F.(2d) 735, but to go further and yield to the contention of the plaintiff here would be to ignore one of the material limitations of the policy."

We are not unmindful of the rule prevailing in the United States courts that a case should never be submitted to a jury simply on the question of probabilities with a direction to find in accordance with the greater probability, and that a mere scintilla of evidence is not sufficient to warrant the submission of an issue of fact to a jury, but, as we view the situation here, that rule is not applicable, there being substantial evidence offered on behalf of the plaintiff which, if believed by the jury, is sufficient to justify their verdict.

" 'Total and permanent disability,' within meaning of war risk insurance policy, does not mean absolute incapacity to do any work at all, but there must be such impairment of capacity as to render it impossible for assured to follow continuously some substantially gainful occupation, and this must occur during life of contract." U. S. v. McPhee, supra.

It might be argued that the fact that plaintiff managed to hold several positions for the greater part of the time during the years in question, and actually engaged in work, proves that he was able to work and not totally and permanently disabled. But this does not necessarily follow. It is a matter of common knowledge that many men work in the stress of circumstances when they should not work at all. When they do that they should not be penalized, rather should they be encouraged. A careful examination and consideration of the evidence herein convinces us that the plaintiff worked when he was physically unable to do so, and that, but for the gratuitous assistance of friends and relatives who did much of his heavy work and the assistance of those whom plaintiff employed at his own expense, he would have been unable to retain his several positions. Under such circumstances, he should not be made to suffer for carrying on when others less disabled than he would have surrendered.

In this connection we quote from the recent case of United States v. Godfrey, 47 F. (2d) 126, 127 (C. C. A. 1) decided February 11, 1931:

"We think the evidence fully warranted the jury in finding that his case falls within Reg. No. 11, as interpreted by this court in Ford v. United States, 44 F.(2d) 754, 755, where we said:

" 'If such claimants are able to follow gainful occupations only spasmodically, with frequent interruptions due to disability, they are entitled to recover under the act.'

"The evidence not only showed that Godfrey did follow 'only spasmodically' his 'gainful occupation,' but that he was 'able' to do less than he actually did—that he went to his place of employment when (as the jury may well have found) he was not 'able' so to do.

"The evidence is persuasive that Godfrey was a war victim. He was entitled to the most favorable view of the evidence. Gray v. Davis (C. C. A.) 294 F. 57; Heisson v. Dickinson (C. C. A.) 35 F.(2d) 270; B. & A. R. R. v. Jones (C. C. A.) 36 F.(2d) 886. To hold him remediless because he tried, manfully, to earn a living for his family and himself, instead of yielding to justifiable invalidism, would not, in our view, accord with the treatment Congress intended to bestow on our war victims. United States v. Cox (C. C. A.) 24 F.(2d) 944; White v. United States, 270 U. S. 175, 46 S. Ct. 274, 70 L. Ed. 530."

Another recent case in point is Carter v. United States (C. C. A. 4) 49 F.(2d) 221, 223, decided April 13, 1931, from which we quote:

"The mere fact that a claimant may have worked for substantial periods during the time when he claims to have been permanent-

ly and totally disabled is not conclusive against him. The question is not whether he worked, but whether he was able to work, i. e., whether he was able to follow continuously some substantially gainful occupation without material injury to his health. Of course, the fact that a man does work is evidence to be considered by the jury as tending to negative the claim of disability; but. the fact that he works when physically unable to do so ought not defeat his right to recover if the jury finds that such disability in fact existed. In the case of tuberculosis the patient is notoriously able to carry on for a while and do a substantial amount of work, but in most cases the attempt to carry on results in an aggravation of the disease frequently ending in the death of the patient. 'To say that the man who works, and dies, is as a matter of law precluded from recovery under the policy, but that one who following the advice of his physician refrains from such work, and lives, is entitled to recovery, presents an untenable theory of law and fact, and emphasizes the necessity for a determination upon the facts in each case whether the man * * * was able to continuously pursue a substantially gainful occupation.'

"The rule applicable in such cases was well stated by Judge Kenyon, speaking for the Circuit Court of Appeals of the Eighth Circuit in U. S. v. Phillips (C. C. A. 8th) 44 F.(2d) 689, 691, as follows:

" 'The government contends that the evidence of his working is so overwhelming that the court should have given a peremptory instruction to the jury. If the mere fact that the insured did work is conclusive evidence that he was not permanently and continuously disabled, then there should have been no recovery on this policy. The term "total and permanent disability" does not mean that the party must be unable to do anything whatever; must either lie abed or sit in a chair and be cared for by others. The test laid down in the cases is well stated in United States v. Sligh (C. C. A.) 31 F.(2d) 735, 736, as follows: "The term 'total and permanent disability' obviously does not mean that there must be proof of absolute incapacity to do any work at all. It is enough if there is such impairment of capacity as to render it impossible for the disabled person to follow continuously any substantially gainful occupation." Some persons, who are totally incapacitated for work, by virtue of strong will power may continue to work until they drop dead from exhaustion, while others with lesser will power will sit still and do nothing. Some who have placed upon them the burdens of caring for aged parents or indigent relatives, feeling deeply their responsibility and actuated by affection for those who they desire to assist, will keep on working when they are totally unfit to do so. The mere fact that insured did work for Smith-McCord-Townsend Dry Goods Company and also for Montgomery Ward & Co. does not necessarily prove that he could follow continuously a gainful occupation.' "

The next assignment of error relates to the admission of plaintiff's Exhibit No. 4, Regulation No. 11, in evidence. It is contended that under the War Risk Insurance Act and under the decisions the said regulation is part of the law, and is a matter for interpretation and construction by the court, not properly one to be read to the jury. The certificate of insurance itself provides that it is "subject in all respects to the provisions of such act, and of any amendments thereto," and it also provides that it shall be subject to "all regulations thereunder, now in force or hereafter adopted, all of which, together with the application for this insurance and the terms and conditions published under authority of the Act, shall constitute the contract." In the case of White v. United States, 270 U. S. 175, 46 S. Ct. 274, 70 L. Ed. 530, the Supreme Court has held that insurance under the act and the amendments thereto is a contract. The regulation being a part thereof, it would seem that it is admissible in evidence. While it is true that the court takes judicial notice of all such regulations, still that fact would not make the regulation any less a part of the contract or render it any less admissible. The court in its instructions to the jury quoted Regulation No. 11, and the mere fact that the jury was informed of the contents of that regulation before the court instructed them in relation thereto would seem to be immaterial. As a matter of fact, it would seem desirable that the jury should know in the early history of the case the definition of "permanent disability" referred to in the certificate. We think that it was admissible, but, if under any theory of the law it was inadmissible, the error was harmless, and did not prejudice the rights of appellant.

Error is also assigned to the refusal of the court to give defendant's requested instruction No. 8 as follows: "You are further instructed that the plaintiff must establish permanent and total disability during the life of his policy, in this case on or before November 30, 1919, and that it makes no difference what his condition is today except as it throws light on his condition at that time."

Appellant admits that the court instructed the jury that the burden was upon the plaintiff to establish total and permanent disability on or before November 30, 1919, but insists that the court gave no instruction relative to the consideration that should be given plaintiff's physical condition at the time of the trial. As we have stated, it is undoubtedly the law that, before a person suing upon a contract of War Risk Term Insurance can recover, he must establish that he became permanently and totally disabled within the meaning of Regulation No. 11 during the life of the policy. It seems to us that the court in unmistakable language repeatedly charged the jury to this effect, and that the jury could not have failed to understand such instructions. We quote from the instructions:

"Gentlemen, it is a question of fact for you to decide in this case whether the insured, the plaintiff was totally and permanently disabled *during the life of the policy.* The policy expired at midnight of November 30th, 1919, by reason of the failure to pay the premium due October 1st, 1919 (later corrected to read November 1st, 1919). To enable the plaintiff to recover thereon it is incumbent upon him to show that he was *permanently and totally disabled at or before that time.*

"Before the plaintiff can recover in this case he must establish to your satisfaction by a preponderance of evidence that he was totally and permanently disabled *at or before the policy expired,* which I have stated to you was on midnight of November 30th, 1919, and when it was in full force and effect." (Italics our own.)

And again: "If you are satisfied from all of the evidence that the plaintiff became totally and permanently disabled as defined in these instructions, *and while his policy was in full force and effect,* it was not necessary for him to make any further payments as premiums after so becoming totally and permanently disabled."

And again: "You will observe that there is one contract of insurance or policy of insurance in the sum of $10,000 sued upon in this action which is payable in monthly installments of $57.50 in the event the insured became permanently and totally disabled during the time that the contract of insurance was kept in force by the payment of stipulated premiums due thereon."

The judgment is affirmed.

WILBUR, Circuit Judge, concurs.