## UNITED STATES v. DEAL.

### No. 7864.

Circuit Court of Appeals, Ninth Circuit.

March 30, 1936.

DENMAN, Circuit Judge, dissenting.

Carl C. Donaugh, U. S. Atty., and J. Mason Dillard, Asst. U. S. Atty., both of Portland, Or., Will G. Beardslee, Director, Bureau of War Risk Litigation, of Washington, D. C., Wilbur C. Pickett, Sp. Asst. to Atty. Gen., and Thomas E. Walsh, Gerald J. Meindl, and Julius Martin, Attys., Department of Justice, all of Washington, D. C., for the United States.

Elton Watkins, of Portland, Or., for appellee.

Before WILBUR, DENMAN, and HANEY, Circuit Judges.

WILBUR, Circuit Judge.

This is an action commenced December 4, 1931, upon a war risk insurance policy which expired May 31, 1919. Plaintiff alleged that he became totally and permanently disabled while the policy was still in force by reason of arthritis of the spine, knees, and shoulders, and from a back injury caused by high explosives. The jury found in favor of the plaintiff, and the government appeals, assigning error in the failure of the court to grant its motion for a directed verdict. That at the time of the trial October 22, 1934, the plaintiff was totally and permanently disabled there is little doubt. That he was seriously injured in battle July 26, 1918, by the explosion of an enemy shell within a few feet of him, is established. Later he suffered a head injury in battle. It is claimed that his present disability is due to these injuries. Assuming this to be true, the question for our consideration is whether or not there is substantial evidence that on May 31, 1919, he was totally disabled and that it was reasonably certain that such condition would be permanent. The plaintiff testified, in part, as follows:

"After getting out of the hospital, I went back to St. Avignon—then went back to my outfit. After about two or three weeks, I got to feeling bad in my back and they sent me to the hospital and taped me from my arms down and I had tape on when they sent me back to the station. After that I couldn't stand the work like I could before. I had to ask the ambulance to help me, and the boys part of the time. My back bothered me then.

"After that I was wounded in the head, in the back part of the head. It was the same year. I was taken to the field hospital and remained about a week. Then I returned to duty and stayed with the outfit three days before the armistice was signed. That was in November. None of the places in my back was a wound.

"From France I was sent to Coblenz, Germany. I stayed there about a month and a half. My back was still bothering me. That was the last time I was in a hospital in France or Germany. From that hospital I went to the Seventh Army Headquarters and there I was told that if I would take an orderly job, I could ride through Germany, which I did. I rode from France to Coblenz, Germany and stayed there about three months. While there I had trouble with my back. I had to climb up the steps there in the hotel. My duty was to wait on the door and to wait on the General and lots of men, and I would catch cold and it was damp and it got in my back which got worse, and I would hardly be able to pull myself up there. I would get up the steps when they would ask me, but it was all I could do. From there I went back to the United States. * * *

"Before leaving France, I had rheumatism. It was in the back and in the hips, and in my arms. When I would have a bad spell, I would use crutches and could hardly go, but that didn't last so long. I was discharged at Fort D. A. Russell, Wyoming."

On April 3, 1919, the plaintiff certified that he had no reason to believe that he was suffering from any disability or impairment of health. On the same day a member of the medical corps certified that he had given plaintiff a careful physical examination and found that he was physically and mentally sound and that, "In view of occupation he was no per cent disabled." Two physicians testified for the plaintiff. They had examined him in September, 1934, about one month before the trial. Both of them related the present condition of the plaintiff to the injuries received in battle. Neither testified as to his ability to work on or before May 31, 1919. The nearest approach to that period was the testimony of Dr. Robert T. Smith, as follows:

"* * * He had a concussion,—probably a contusion, for this record shows a direct injury to the spine. He had a concussion probably, a contusion of both his brain and spinal cord. His condition amounted practically to the same thing as an earthquake would affect a building. It strained and injured every joint in his body and although the building or structure was of steel and it stands yet, the joints are so disturbed and so strained that nature began to attempt to repair them by causing an excess deposit of calcium,—it would throw it out,—this calcification would occur like a concrete man would repair damaged joints with concrete. That is exactly what nature was doing, just as a concrete man would repair with concrete a damaged joint. This man has, in addition to his spine, an involvement of his shoulder, and I think it is his wrist joint, * * *. His shoulder and knee joints.

"Deal also has an old depressed fractured skull. A blow or explosion of the kind it is described was suffered by Deal might bring on pains months afterwards and from then on. A high explosive wrecks the whole physical structure. Every joint in the body is damaged. Thereafter if the victim attempted to move or work, or apply himself in any way, shape or form, he would experience stiffness and pain and discomfort at all time—even on slight movements. There is no cure for this condition. He should experience great discomfort, a great amount of pain and limitation of motion to any joint in his body after a high explosion blow."

The government's records concerning the plaintiff's condition were examined by this witness, and were introduced by the plaintiff. The witness made no effort to contradict or explain these records in the light of his evidence upon the effect of a high explosive. They show the injury to plaintiff's back in July, 1918, and his hospitalization for eighteen days thereafter; his hospitalization for acute enteritis for fourteen days in October, 1918; and his discharge from the army with no

disability. He was examined September 23, 1919, after his policy of insurance had expired, by Dr. Louis J. Wolf and Dr. R. C. Yenney, of the Public Health Service. Their report states, in part, as follows:

"Present complaint: Back is weak and painful—when he goes to bed after a days work, back continues to pain and is stiff and sore in morning. Work, such as stooping over is difficult because when coming to erect position considerable discomfort is experienced. Says that occasionally is unable to work.

"Physical examination: Height 5 ft. 10 in.; weight 168. Well developed, well nourished. Head and neck normal—teeth good—tonsils clear—chest well developed—lungs clear—heart regular, no murmurs—abdomen neg. Spinal column: No abnormal curvature, a slight point of tenderness over sacral region. From the examination of this man, the result is negative. From his own history a diagnosis of sprain of back is made.

"Diagnosis: Sprain of back.

"Prognosis: Indefinite.

"Is claimant able to resume former occupation? Yes.

"Do you advise it? Yes. Is claimant bedridden? No."

He was again examined January 7, 1920, by Dr. Dwight F. Miller. His report is, in part as follows:

"Present complaint: Back is weak, pains, bothers him at time he tries to sleep. He cannot lift or do days work.

"Physical examination: Height: 70¼ in.; weight 167 lbs. Sight negative.

"Diagnosis: Sprain of back. Prognosis: Good.

"Is claimant able to resume former occupation? Yes.

"Do you advise it? Yes. Is claimant bedridden? No."

He expressed the opinion that the plaintiff's disability was temporary and minor, and that there was no vocational handicap.

In May, 1920, the plaintiff was examined by Dr. Victor H. Lemeaux, who certified that plaintiff was unable to resume former occupation; that the prognosis was good; that plaintiff was advised to avoid heavy lifting.

On October 29, 1920, Dr. A. J. Peaf examined plaintiff for the Public Health Service. He certified to the plaintiff's complaints of a lame back, and to frequent attacks of rheumatism. He expressed the opinion that the plaintiff was able to resume his former occupation and that he so advised. As the next examination was nearly three years later, we turn to a consideration of other evidence concerning plaintiff's condition shortly before and after his policy lapsed.

On May 23, 1930, plaintiff made an affidavit for presentation to the Veterans' Bureau in which he stated: "I worked for myself driving a transfer truck from 1919 to the summer of 1921; from the summer of 1921 to about the first of the year 1922, I worked for Virgil Staples as a farm hand at Ontario, Oregon." In May (year not stated) the plaintiff certified to Veterans' Administration that he worked as a contractor from May, 1919, to December, 1922; that he worked as a logger at $7.50 per day from January to May, 1922, and as a sawyer at $4 per day from September, 1922, to September, 1923. On May 16, 1930, plaintiff wrote the Veterans' Administration for a more favorable compensable rating from March, 1921, to March, 1927, stating: "I believe my condition during this period was at least ten per cent (10%) disability. * * * I further believe that the examination made in 1923 should show a condition of the spine of at least ten per cent (10%), as at this time I was suffering with back trouble, wearing a belt to support back." With reference to plaintiff's work from in 1919 to the summer of 1921 plaintiff testified as follows:

"When I returned from the war my first work was in the trucking business. I had a couple of men hired to drive for me. The business was between Rainier and Portland. My work was to manage the business. I couldn't stand it to drive a truck, it would shake my back so bad. It bothered my back and hips. I had two trucks and a man for each truck. * * *

"I don't know how long I was in the trucking business. Part of the time I had two trucks and part of the time three trucks—two men working with me when I had two trucks. I didn't run a regular truck line between two points. It was just a transfer business. Part of the time I had an office where people could call on me, in my brother's shoe shop. One of the trucks was a light Ford truck. I did not at any time haul logs. That continued for about a year. During that time I built up my business so that I im-

proved my financial ability to procure another truck. It might have improved me to this extent that I had to quit and go into bankruptcy. I bought the second truck with my note, but I couldn't pay the note. He got his truck back. I gave up this business because I wasn't able to attend to it. I lost it and had to go through bankruptcy. I got nothing for my business. Business conditions were good in Rainier at the time, as I recall it. I had to go about day and night, and I wasn't able to attend to the business I had. There was plenty of business if I could have attended to it. * * * If I had made substantial amounts of money, I would not have gone into bankruptcy."

Plaintiff testified that he secured a job as choke setter and hook tender for the Koster Products Company at $6 per day. He did not remember the date of his employment, but his affidavit filed with the Veterans' Administration in 1930 fixed the date as December, 1923. With reference to his physical condition at that time he testified as follows:

"The work for the Koster Products Company lasted about three weeks and I was discharged. My pay was $6.00 per day. It was in the logging business. I was supposed to be cutting chokers and one time was hook tender. * * *

"I worked at this job as a choke setter before the war and knew that it was a job requiring great physical activity. It is also a dangerous job because it requires one to move about rapidly. I felt that I could handle the job when I took it or that I had to try it anyway. I don't know whether I thought I was totally disabled at the time I undertook this choke setting work in the woods or not, but I know I had some awful pains from that rheumatism. I was in hopes it would get better. If I had thought at that time I was totally disabled, I would have started my suit right away, but I didn't know whether I would get better but I thought it might get better."

He further testified: "I had not corresponded with the government about insurance or had any transactions with the government about insurance at this time. Not until I filed suit against them. I began to think of this suit against the government a few days before I filed the suit. The pains I had in my back made me think of filing suit. I read about it in the newspaper and saw I wasn't going to get any better. The doctors told me there wasn't any cure for me, so I proceeded to see my lawyer about it and filed suit."

Plaintiff testified that he worked continuously for two years: "The longest job I had was with the Menefee Lumber Company for something like a year. It might have been a little over that or might not have been so much. I also worked for the Beaver Lumber Company about the same length of time. The first real job I had was with that company, where I worked on the edger, picking off lumber from it."

■ This work record is conclusive against the plaintiff unless it can be shown, as in tubercular and heart cases, that such work imperiled his health. There is no attempt to make any such showing. The plaintiff testified that he suffered great pain when he worked, and that he used aspirin, heat, and moonshine whisky to allay his pain; but it is established that the fact that work always causes pain is not proof of total disability. U. S. v. Kerr (C.C.A.) 61 F.(2d) 800; U. S. v. McCreary (C.C.A.) 61 F.(2d) 804. Neither is the fact that his first year's work resulted in bankruptcy sufficient to negative the fact that he worked, and was able to work, in a substantially gainful employment. Plaintiff testified that he strove to overcome his handicaps of pain and suffering, and of physical incapacity, because of his desire to support his parents. This is most commendable from every point of view, but is no reason for submitting to a jury the question of whether he was able to do what he had done.

We have so far considered the evidence of conditions nearest to the decisive date of May 31, 1919. Evidence of his subsequent condition and work up to 1934 was introduced, but is only relevant in so far as it tends to show his condition prior to May 31, 1919. We will briefly refer to that evidence, bearing in mind the testimony that arthritis is a progressive disease.

The record shows that this was true in the case of plaintiff. He was examined on August 14, 1923, by Dr. J. L. Scripture at Portland, Or. It was found that plaintiff was wearing a soft leather belt to support his back; that there was evidence of an old chronic arthritis; that he was able to resume his prewar occupation of general labor in sawmills. On the next day (August 15, 1923) Dr. A. E. Tamiesie

conducted the neuropsychiatric examination. As to the lumbosacral region the doctor stated, in part: "Complains of aching at times and stiffness on extreme flexion. No disorder in locomotion. No paralysis. No atrophy." He also certified that the plaintiff had no vocational handicap from the neuropsychiatric standpoint. On August 15, 1927, the plaintiff was examined by Dr. M. B. Marcellus and the hospital staff of the United States Veterans' Hospital prior to an operation for hemorrhoids. He remained in hospital until August 27, 1927, when he was discharged. Prior to his discharge X-rays were taken which showed chronic hypertrophic arthritis mild of the lower lumbar vertebræ. "Guarded." The board certified that in their opinion "he has a permanent partial disability on account of No. 2. [arthritis]." On May 23, 24, 1928, it was found that arthritis had "somewhat increased over previous examination. * * * Examination shows moderate limitation of motion of the lumbar spine, with tenderness on deep percussion and some muscle spasm." Complete rest was recommended.

On July 23, 1929, plaintiff was again examined at the United States Veterans' Hospital, Portland. It was stated in the report of the examination that: "The X-ray at this exam. demonstrates disease in dorsal spine as well as lumbar, and his condition compared with last exam. is gradually becoming more severe, with more spine involved and this is a marked disability for any manual labor, or long standing or sitting. Diagnosis: Arthritis, chr. hypertrophic, dorsal and lumbar spine marked degree. Disabilities are permanent, Recommend a light Taylor brace without crutch attachments, and if he becomes more disabled after a few years I advise a course of physiotherapy."

He was again examined May 5, 1930, when it was found that his back "lately has become progressively more rigid. * * * The lower dorsal and lumbar spine is rigid."

December 5, 1931, the plaintiff suffered a paralytic stroke. He was hospitalized until January 7, 1932, when he was discharged "improved, apparently recovered." Before his discharge January 7, 1932, he was again examined by the physicians of the United States Veterans' Administration. Dr. Geo. E. Pfeiffer certified that: "Dorso lumbar spine almost fixed (80%) * * * Arthritis, multiple, knees and shoulders, subjective, moderately severe." On April 4, 1932, plaintiff was again examined. Plaintiff stated to examiner: "Since leaving here the arthritis seems to be getting worse. Legs are getting stiff. Right knee and right instep seems to be worse. Am getting arthritis in shoulders and legs now." The examination shows: "Loss of motion in spine, flexion limited 25% extension, backward motion, limited 25%, but other joints are easily put through flexion and extension to a normal degree. No heat, swelling or redness."

A year later, March 27, 1933, Dr. Chas. Bloom, consultant of Veterans' Administration, reported as follows: "Pt. Complains of severe pain in lower dorsal and in lumbar region of spine. There is practically no flexion or rotation of these areas and only very limited lateral bending. There is marked spasticity of the left erector spinse, with somewhat less rigidity of the right. T. 98, P. 80. Diagnosis: Spondylitis, chr. hypertrophic, spine." From March 3 to 27, 1934, plaintiff was under examination at the United States Veterans' Hospital at Portland. The report states: "There is less pain now, but limitation is practically the same. His condition is severe of the spine and moderate of the shoulders and knees. It is permanent."

It is unnecessary to state the plaintiff's work record other than above. It is substantial. The one physician called as a witness for the government, on cross-examination by plaintiff, testified that in his opinion the plaintiff's arthritis was not caused by the high explosive "which hurled him twenty feet"; but this is immaterial. There was no substantial evidence that plaintiff was totally disabled on May 31, 1919, and no substantial evidence that such disability as he had was reasonably certain to continue.

The motion to instruct the jury for the defendant should have been granted. For error in refusing to so instruct the jury the judgment is reversed.

Reversed.

DENMAN, Circuit Judge (dissenting).

In this case there was evidence that the gainful work done by the soldier tended to aggravate a permanent disease, incurable from the beginning. The ques-

tion of law involved is a very simple one. It is, "whether, where the soldier has an incurable progressive permanent disability arising from a war cause and during the life of his policy, the performance of considerable gainful work during the earlier stages of the disease, establishes his disability as not total, *though all such work aggravates the disease and tends to endanger the health and shorten the life of the insured?*"

In my opinion the case falls within the language of Justice Butler in Lumbra Case and the decisions of this Circuit and of the Second, Fourth, and Tenth Circuits upon which Justice Butler relies in his summary of the law: "The mere fact that one has done some work after the lapse of his policy is not of itself sufficient to defeat his claim of total permanent disability. *He may have worked when really unable and at the risk of endangering his health or life.*" (Italics inserted.) Lumbra v. U. S., 290 U.S. 551, 560, 54 S.Ct. 272, 276, 78 L.Ed. 492. Justice Butler cites U. S. v. Lawson (C.C.A.9) 50 F.(2d) 646, 651; Nicolay v. U. S. (C.C.A.10) 51 F.(2d) 170, 173; U. S. v. Phillips (C.C.A. 8) 44 F.(2d) 689, 691; U. S. v. Godfrey (C.C.A.2) 47 F.(2d) 126. In each one of these cases there was a work record comparable to that of the soldier here. The language of the specific pages of two of these opinions to which Justice Butler refers is as follows:

"It might be argued that the fact that plaintiff managed to hold several positions for the *greater part of the time during the years in question,* and *actually engaged in work,* proves that he was able to work and not totally and permanently disabled. But this does not necessarily follow. *It is a matter of common knowledge that many men work in the stress of circumstances when they should not work at all.* When they do that they should not be penalized, rather should they be encouraged." (Italics inserted.) U. S. v. Lawson (C.C.A.9) 50 F.(2d) 646, 651.

"Again, the word 'impossible' must be given a rational meaning; it cannot fairly be said that it is 'possible' for an insured to work because, under the stimulus of a strong will power, it is physically possible for him to stick to a task, *if the work is done at the risk of substantially aggravating his condition.*" (Italics inserted.) Nicolay v. U. S. (C.C.A.) 51 F.(2d) 170, 173.

The holding of these cases is in no wise affected by decisions holding that if the disease is *curable* there is no permanent disability, even if by working the cure was prevented, such as the recent case in this Circuit of Deadrich v. U. S., 74 F.(2d) 619, 623. There the disease was curable and our court relies on the following: "'* * * An insured who is suffering from a curable disease cannot through his own neglect and inaction permit the disease to progress to the incurable stage, and then assert a liability on his insurance contract on the ground that the disability was permanent at its inception, without some proof thereof.' U. S. v. Ivey, 64 F. (2d) 653, 654 (C.C.A.10)."

The case of U. S. v. Spaulding, 293 U.S. 498, 504, 506, 55 S.Ct. 273, 79 L.Ed. 617, asserts as still controlling, the law as above quoted from Lumbra v. U. S. In the Spaulding Case the expert testimony is that Spaulding's disease was not shown to be incurable at the time he contracted it but, on the contrary, is "that he might have recovered." (Dr. Bryan, 504). Obviously if he had recovered he could thereafter work as an aviator or at other employment without danger to his health. He therefore did not have *permanent* disability within the phrase "total and permanent disability." In Deal's Case, as stated more fully infra, both physicians testified concerning the gradual calcification of his back: "There is no cure for that condition" (r. 62); "No cases of this kind are curable" (r. 63); "There is no cure for this condition" (r. 71).

The soldier's case is a very plain one of a disease incurable from the beginning, the progress of which he hastened to paralysis by the work he performed. It is that while in war service in France he received an injury to his spine and head, caused by an exploding shell. Later, also in battle, his skull was again injured. As a result there was continuous and permanent inflammation of the vertebral joints, from which calcareous matter was certain to be continuously deposited in the joints until the spine would become, as it practically did, a solid and immovable single calcified structure.

The soldier, not being advised by the government physicians or otherwise of the permanent and dangerous character of his injury, worked for considerable periods before the solidification of his backbone prevented further effort. His work

always caused increased pain at the point of injury, showing that, at the same time, it caused an increase in the permanent inflammation, thus inferably increasing the "danger to his health," as that term is used by the Supreme Court and by this court.

His testimony that ever since his injury, whenever plaintiff endeavored to work he *always* suffered severe pains in the spinal region is as follows:

"During all that time I was *miserable*. My feet, legs and *back* wouldn't hold up and I had a headache, but I had to keep on working. I was always taking aspirin. I took it all the time. I had to have something to go on with my work and many times I drank whisky—just enough to kill the *pain*. I also heated a brick to stand on to keep my feet and legs from hurting so. It seemed to ease the pain the same as when I put a hot water bag or electric pad on my *back* or feet. I also used hot liniment and lots of things when I was working. *After working* I could go to sleep alright sometimes, but if I twisted myself or turned, I would wake up *because my back was so sore.* This would start the pain. * * *

"I had fearful *pains* when I *had to stoop over.* I used these heat applications pretty often. I took aspirin pretty regular during the year. * * *

"When I would go to bend my back or lift anything I would get down and couldn't get up. I couldn't bend my back. It wasn't over a month after my discharge. I couldn't bend my back. I would be walking along without pain and then I would catch my back and would have to stop. These attacks would last an hour or so. My back and other parts of my body were *sore.* It was miserable. It started out in my lower back and hips, but it went all over my back later. * * *

"*Before leaving France,* I had rheumatism. It was in the back and in the hips, and in my arms. When I would have a bad spell, I would use crutches and could hardly go, but that didn't last so long."

A jury may properly be warned that pain may be simulated. However, in this case, on September 23, 1919, shortly after his policy expired, plaintiff was examined by two government physicians. The pain then suffered by the soldier in his back and hips, as a result of his attempts to work, is found in the following portion of their report: "Present complaint: Back is weak and painful—when he goes to bed after a days work, back continues to pain and is stiff and sore in morning. Work, such as stooping over is difficult because when coming to erect position considerable discomfort is experienced. Says that occasionally is unable to work."

It is a matter of common knowledge that pain ordinarily accompanies and hence evidences inflammation; and that arthritic calcareous deposits may increase with a use of the infected region causing inflammation. If it were not a matter of common knowledge, the following from the testimony of Dr. Alan Welch Smith warrants such an inference by the jury:

"In Exhibit B, the government report shows an old proliferitis. That means a *throwing out.* An extension of an old injury which he has.

"This arthritis which he had would be likely to follow some injury. The indistinct and hazy appearance of the X-ray would indicate an inflammation in that immediate locality. Chronic arthritis is an *incurable* arthritis, and arthritis is *inflammation of the joints.* It means inflammation and articulation where two joints join together, and where they get *inflamed in that joint,* it is called arthritis. In arthritis the *pain* is more progressive than in rheumatism.

"In my opinion this injury from which this man is suffering is the direct result of some previous injury or accident. My conclusion is based on the fact that his *vertebræ below the small of his back shows practically no indication of any arthritis or injury to the vertebræ.* Above that, and from that up to the *base of his head, including his neck,* shows a condition that could be, in my opinion, only brought about as the result of an injury, because if it had been a general condition, rather than a local condition, the whole body would have been affected and there would have been fine *calcareous deposits* in *other parts* of the body. The structure of this man appears to be like a house that has been struck by an earthquake. The house has not fallen but he, the man, is virtually—but it, the house, is so shattered. In this case he, the man, is alive, and in it but the average house would be torn down. The experience which he had in the explosion of this shell, having been hurled through the air and having his clothes torn to shreds, probably would set up the de-

structive reaction which we find in this case—the rigidity of the spine. The *pain* he suffered could have come from the blow such as the one described which he suffered to his back. His condition is of some long duration. *·* *

"Now you see the narrow spaces between the two vertebræ. That is supposed to be cartilage. *It is supposed to be cartilage which has virtually absorbed and that will cause a solidification or rigidity of this spine.* There is nothing between that (indicating). It is solid. At this point there is a spear formation,—the formation of a spear on the end of that vertebræ (indicating). Likewise, here and as you see, some of these are narrow,—clearly obliterated,—solid now, probably. Here is this man's neck. It shows that this condition here from which he is suffering and has suffered is ascending. This is the cervical vertebræ. This is the base of this man's skull (indicating), here is his head and jaw. These vertebræ are as you will notice here,—they indicate, with this haze, which I spoke about a moment ago,—indicate that this is ascending and *throwing out a calcareous deposit,* causing a stiffness of his neck, which seems to be progressive. * * *

"You will note that this intervertebral disc, these intervertebral discs are these shadows which you see, between the vertebræ (indicating). I think at no place ought they to be as thick as that (indicating). Here, may be more (indicating). *That is the result of inflammation of the cartilage in between there which has been absorbed.* I will call your attention to another thing; you will notice how this extends out beyond the body of the vertebræ—that halo is because the tissues meet in apposition to this column—they have been insiltrated. That is, if we had a fluid here and the river overflowed, the surrounding country would be inundated and the water would back up. Likewise, *inflammation of this man's spine* which shows very distinctly; the outlying tissues have become hazy as it appears on these pictures—*showing inflammation.* There has been a certain amount of calcareous or bone formed—bone forming tissues that have been thrown out and that gives it that curious hazy appearance. I draw my own conclusion from this and that is that part of the spine, from here down to here is practically,—it has lost its flexibility and it is rigid or solid, approximately solid, —the back has become ankylosed."

From the evidence the jury was entitled to infer: (1) That the soldier's back and head were injured in battle; (2) that he at once suffered the pain of what he called "rheumatism" in the injured part of the back; (3) that the pain continued in the injury, whenever he moved the back in work or bending over, from the inception of the injury until the complete calcification of the backbone and ensuing paralysis; (4) that this evidenced the malady described by his physician expert as "chronic arthritis"; (5) that this malady was, as testified, "incurable"; (6) that the malady is an inflammation in the joints of the vertebræ causing the secretion of the calcareous matter which solidified the spine; (7) that the greater the inflammation the greater the secretion and the quicker total calcification and paralysis; (8) that the pain always caused by the gainful bodily work he performed, showed it increased the inflammation, hence the greater formation of calcareous matter, and hastened the paralysis; and hence (9) that his gainful employment was, in the words of the Lumbra Case, "at the risk of endangering his health or life," and hence made his disability none the less total.

We have no right to take from the jury the inference that the soldier's physical labor, causing or increasing pain, meant increased inflammation of the joints of the spine and hence an increase of the "bone forming tissues that have been thrown out." with the attendant calcification.

The only gainful attempt made by the soldier, other than that at rude labor, was in the trucking business, which went bankrupt. On the question whether the soldier has sustained his burden that, with his impaired physical condition he was a person incapable of self-support in any *other occupation,* it is obvious that one of the principal items of evidence was the mental capacity and adaptibility of the plaintiff himself. Keith v. New Haven &, etc., Co., 140 Mass. 175, 3 N.E. 28. These qualities or the lack of them were under the observation of the judge and jury while the plaintiff was undergoing protracted direct and cross-examination. They were evidence to the judge when he denied the motion for a directed verdict.

We are here considering the sufficiency of the evidence to reverse a verdict on the ground of the failure to instruct for the defendant. We are hence required to as-

sume that the trial judge concluded that this "fourth reader" man, with this injury, is obviously so lacking in adjustable intelligence and initiative that the jury properly concluded that, just as in the attempted trucking business which ended in bankruptcy, and which he testified "he was not *able* to attend to," *any* business he went into would wind up in bankruptcy.

Apart from mental qualities, a sedentary business requires continued effort in the spine in control of a sitting posture. Such effort may increase the pain to a point that even sedentary occupation cannot be pursued by one with a diseased spine, even if mentally qualified. It was a question for the jury whether this man with his limited education, doing nothing but rude labor before injury, had the mentality which, in connection with the pain he suffered, could acquire any gainful occupation at all, much less one that would not endanger his health.

Miller v. U. S., 294 U.S. 435, 440, 55 S.Ct. 440, 442, 79 L.Ed. 977, holds nothing contrary to this conclusion. There an able-bodied man lost one arm and had one defective eye, and the question was whether he had shown himself incapable of acquiring any gainful occupation. Instead of maintaining his ·burden of proof, the opinion shows that he did not make "any effort to engage in other work which ordinarily a one-armed man with one defective eye could do."

It does not appear that the trial judge with his knowledge of the facts, in such pertinent part of the real evidence of his mentality as shown on the stand but not appearing here, erred in permitting the case to go to the jury, and the judgment should be affirmed.