## UNITED STATES v. McCREARY. *
### No. 6811.

Circuit Court of Appeals, Ninth Circuit.
Nov. 14, 1932.

*Rehearing denied January 9, 1933.

George Neuner, U. S. Atty., and Chas. W. Erskine, Asst. U. S. Atty., both of Portland, Or., and W. C. Pickett, Atty., Veterans' Administration, of Washington, D. C., for the United States.

C. G. Schneider and Allan A. Bynon, both of Portland, Or., for appellee. ·

Before WILBUR and SAWTELLE, Circuit Judges, and NETERER, District Judge.

NETERER, District Judge.

Appellant claims error on denying a motion for directed verdict for insufficiency of evidence. It is admitted that a war risk insurance policy was issued to plaintiff while in service, and was in force at discharge.

The plaintiff testified, in substance, that while in service he was under "shell fire." "We went in a dug-in in a hill and we dug into what was called 'Dead Man's Hill.' * * * We were there only four hours. Shells exploded within ten or fifteen feet of me and the man next to me died * * * The dysentery was—the bowels run off. It was the diarrhea. That is what I think it was * * *. I was in the hospital at Selincourt. * * * I think they called it influenza."

From the hospital he joined his company and entered into the Saint Mihiel offensive, was detailed to guard duty. He was left at Hospital No. 1 after the Armistice was signed, and from the hospital went back to Contrexeville, France, Base No. 36. Left there after the 1st of January, 1919. "In the hospital there I believe they treated me for intra-colitis, or inflammation of the bowels, or dysentery."

"Q. When did you first discover that you were having trouble with your heart? A. Well, it bothered me some at the time we got out but not a great deal. I think it has got worse in the last two years." (Verdict returned October 1, 1931.)

He says he was nervous at discharge and the first two or three weeks he took very lit-

tle time off. "The doctor told me to lay around for four or five days the first time I took sick and then go back to work, and at different times I had to take time off. I think there were five or six days that I did nothing until toward the last." "In September, 1919, I went to work for Mr. Strubin, and worked for him until April * * *. Then I was off until * * * the first of May. Then I worked until August 15, 1920. * * * I came back to help him milk those cows. * * * I think there were 42 cows milking while I was there (Strubin said 48). We would milk the cows twice a day. We would start at 4 o'clock in the morning, and I and the other man who worked there would be through by seven or seven-thirty for breakfast. In the afternoon we started around 4 o'clock. While I was out there I was bothered with this weakness and a diarrhea. * * * When I was out there in 1919 and 1920 I went through a complete examination and when I got through I never knew what was the matter with me or what was not.

"Q. It was not until 1925 that you had anything wrong with your stomach? A. Yes, I knew I had something wrong but what I had or what was wrong I didn't know. * * * I quit in August, 1920, to get married. After about three or four weeks I went to work for * * * Fernwood Dairy in town. I continued to work for him for about a year,—with the time I was off, a little better than a year. I was off eight weeks at one time for an appendix operation. * * * Assuming I went to work there in September, 1920, I worked there until—I believe it was in October, 1921.

"Q. Then the rest of the year you have not accounted for your work? Did you work the rest of the year? A. Yes, I worked. Let me see—I worked at the saw mill for ten days or two weeks. * * * I went up there in 1922—January or February. Before I went onto my own place I worked for Mr. Bowman on his place east of Gresham. I did dairying work there. I think I continued that work something like three weeks. Then I bought my own little place and my wife and I went onto that little place to live for about a year; about 11 months, from May, 1922, until about the 1st of April, 1923. I worked a few days at the neighbors when I went out there first and during the summer of 1922 I done very little work, but my main business was running the ranch during that year, outside of a few days that I may have worked for some neighbors. * * * I be-

lieve it was May, 1923, I went to work for the Davidson Bakery Company, and I continued the work for eight or ten months." The following appears to be stipulated as to wages received at this place:

Commencing with

| | |
|---|---|
| May 21, 1923, 8 days, earned ..... | $ 32.00 |
| June, 1923, lost 2 days, earned ... | 104.00 |
| July, 1923, lost 2 days, earned .. | 102.00 |
| August, 1923, lost 3 days, earned .. | 108.00 |
| September, 1923, lost 5 days, earned .............. ........ | 100.00 |
| October, 1923, lost 4 days, earned.. | 104.00 |
| November, 1923, lost 4 days, earned | 104.00 |
| December, 1923, lost 5 days (worked one day extra) .............. | 104.00 |
| January, 1924, lost 16 days ...... | 68.00 |
| February, 1924, lost 9 days ...... | 86.00 |
| March, 1924, lost 5 days ........ | 117.00 |
| Did not work after the 31st day of March, earned a total of ...... | $1029.00 |

The plaintiff continues: "I went to the United States Veterans' Hospital for observation and treatment, either in January or February (1924), I am not sure. It was during that time that Dr. Campbell examined me."

Dr. Campbell, although available, was not produced by the plaintiff, but for the defense. Dr. Campbell testified:

"Refreshing my memory from the notes and records I kept of the examinations of Carrol T. McCreary *. * * he entered the * * * United States Veterans Hospital,—on February 4, 1924, and remained until February 9, 1924, undergoing a complete G. I. examination which took all of this time. Referring to my notes—a fractional gastric analysis was made on the 5th and the highest acidity reported was 96; blood count on the 5th was negative; stool examination was asked for but patient did not comply so that his stool examination could be made; X-ray gastro-intestinal series was begun on the 6th and not completed until the 9th. That was negative. A spinal X-ray examination on the 5th was made and it was negative, except Spina Bifida Occulate was found and patient given credit for same. The barium examination was negative and the Wasserman was negative and the urine was negative.

"Gastro-intestinal series is a modern method of ascertaining the condition of the stomach and the gastro-intestinal tract by giving barium per mouth and watching with the fluroscope the barium pass down into the stomach and out into the bowels. Every so

often prints are made of the barium and the barium is traced through the entire gastro-intestinal tract and we know the normal reaction, how long it takes for the barium normally to pass down through, and when we have an abnormal slowing or rapidity that indicates certain things.

"Spina Bifida means there is an abnormal outgrowth of bone that interferes with the movement of the vertebrae, impedes the movement of the vertebrae. This is considered a serious impairment by the medical profession if it progresses far enough. It depends greatly on how many vertebrae are affected. * * * The claimant was not bed-ridden. He was able to travel. Hospitalization was not advised at this time. The patient would accept hospitalization if it was necessary. An attendant was not necessary, training was feasible, showing that the previous findings of Spina Bifida condition has not developed to cause a great handicap at that time. * * *

"Referring to * * * examination * * * of Carrol T. McCreary on January 20, 1925, will state that (he) * . * * came in complaining of gall bladder trouble and a gall bladder examination was made and found negative on this date. There was no diagnosis; diagnosis was negative; no prognosis was made. * * *

"In my examinations of Carrol T. McCreary I did not find any impairment of mind or body what would altogether preclude him from following a gainful, substantial occupation. * * *

"To my knowledge there was no indication of dysentery. There was no indication of amoebiasis, but we could not rule this out definitely because the patient did not cooperate with us to the extent of giving us a stool for the examination. * * * There was no indication of ulcers of the stomach, as proven by our gastro-intestinal examination and X-rays at that time."

The plaintiff continued: "Then in the spring of 1925 my wife and I went back to our place for about two years, but I do not remember the dates. We lived there about two years and during that time I worked for the City of Portland and did few other small jobs. * * * I went to Brooks Scanlon in March, 1928 (for a short time); I was out there at Camp No. 4, falling logs and barking. * * * I was paid by the foot. I think the best scale I made was somewhere in the neighborhood of nineteen thousand or something; it was something less than

twenty thousand. * * * This was for one day. * * * I went to see Dr. Joyce. * * * After I finished Dr. Joyce's clinic a recommendation was made to me for an operation for this ulcer in my duodenum. I never had that operation because I am afraid of it. I think it would be quite a gamble. I have seen many of them who have had that operation performed and they were no better afterward. I believe I have seen a few the other way."

His family physician testified that in the early part of October, 1919, plaintiff consulted him, and he found he had tenderness in the abdomen and had had a diarrhea. He seemed very nervous and restless as he was sitting in the chair. He says: "I remember one particular time he came to the office in 1921 and he complained of more pain at that time than usual in his right side, and I diagnosed it as appendicitis. I referred him to Portland surgeons." He had his appendix removed at the Good Samaritan Hospital by another doctor. This doctor did not treat him again until "several years ago" he was called and found plaintiff "very sick." He was short of breath and was sitting in a chair with a blanket around him, his feet in hot water. He was "bothered with his heart." And he examined him a few days before the trial (October 1, 1931), and said that he had a dysentery which has weakened him; he is nervous and has had a weak heart, lost weight, and "is not what I would say a strong man. I have been there when he had the dysentery. I did not see the stools passed, but that is the report." He says: "I do not think he has T. B." In 1921 he diagnosed appendicitis. In 1924 or 1925, was the only time since 1919 that this doctor treated him professionally. The "nervous condition," he says, "just getting up and going to the window and lighting a cigarette and smoking a puff or two and throwing it down. * * * I would not consider * * * sitting down a while and getting up and smoking a cigarette a short time—a sufficient disability to keep a man from working." The doctor stated, on cross-examination, that the plaintiff could direct the affairs of a dairy, direct the care of the cows, feeding, milking, etc. And when asked: "Could he do that today?" Said, "Yes, I think he could." The testimony shows plaintiff a practical dairyman, etc.

Another doctor testified that he examined the plaintiff September 8, 1920, and diagnosed his condition as "ulcer and renal glycosuria—duodenal ulcer. Duodenal ulcer is an

ulcer of the peloric portion of the stomach—of the duodenum. * * * He had a typical history that comes on three or four hours after they eat and goes away after they eat food or take soda bicarbonate. The usual thing is pain and discomfort."

In response to the question: "Do you know what the infection was that caused this condition—the diarrhea or dysentery? A. Nothing aside from what I heard. We made a test there and found nothing in his stool." Asked:

"Now, is there any relation between the time that Mr. McCreary has this trouble—this diarrhea which was the first thing that he complained of, and the geardia? A. If he had that it might have been possible that was the cause of it, yes.

"Q. Is there any relation between that and the duodenal ulcer? A. I cannot say as to that."

The doctor examined him four or five days before trial, and saw no change. "I would say that this man in his present condition is totally and permanently disabled from following continuously any substantially gainful occupation; that is, he is permanently and totally disabled." And, assuming the same condition to have prevailed since discharge, "I would say he was totally and permanently disabled from that time on." This examination, testified to, was made September 8, 1930.

The doctor stated the duodenal ulcer and the kidney infection permanently disabled the plaintiff; that the duodenal ulcer was a permanent condition; and also said: "That some duodenal ulcers yield to treatment, medical treatment, and if that failed, surgery; that a person afflicted with duodenal ulcers is not necessarily permanently afflicted," and "duodenal ulcers can be cured by medical science." And again: "I would not say that it can be or can't be cured; some are and some are not." And recommended surgery to the plaintiff, that in some cases surgery cured the affliction.

Again: "There was no amoebae in the stool" found by the test. "From an examination of the stools, I found nothing wrong—nothing pathological or showing evidence of any disease. I found no geardia parasite. * * * He was nervous when he was examined." The doctor said, in response to the question whether the nervousness would prevent him from doing some kinds of work, "I don't think I am qualified to say whether it would."

There was considerable evidence by neighbors and friends of the plaintiff, by expressing opinion: "I would say he did the best he could." "He was not able to do the heaviest work we had." "He was not actually able to do as much work as other men on the job." "He was very weak and unable to work." "He would do work two or three days here and there, and would have to quit on account of his condition." "He is getting worse all of the time." "He is not a strong man." These expressions of opinion are not statements of fact. If appellee was not totally and permanently disabled at discharge and all of the time since, his present condition and reasonable certainty as to his future condition is immaterial. There is no evidence carrying a quality of proof or having fitness to produce conviction that reasonable minded persons may fairly differ as to whether or not it proves the fact in issue. There is no such evidence as total and permanent disability. Appellee was practically continuously employed from September, 1919, to March, 1924, at substantial wages; from September, 1919, to August, 1920, except four to six weeks, he worked for Strubin; he quit work to get married; and from September, 1920, to October, 1921, he worked for Fernwood Dairy, and then did odd jobs until April, 1923; and from May, 1923, to March, 1924, he worked for a bakery.

 There is no substantial evidence that plaintiff was totally disabled, and the evidence refutes total and permanent disability. A doctor testified that in September, 1930, more than eleven years after the discharge, he found evidence of duodenal ulcer and renal glycosuria, and at that time plaintiff was totally and permanently disabled; and the same doctor testified that the duodenal ulcer was not necessarily permanent, and, assuming the same condition to have existed since discharge, he was so disabled from discharge in August, 1919. There is no evidence to support such assumption. There is evidence that there was no such ulcer in 1924, and at this time "there was no indication of dysentery. There was no indication of amoebiasis," "no geardia parasite." And the nervousness, predicated on fact, was stated by his family doctor not to amount to such impairment.

Plaintiff's affliction was not progressive, as active tuberculosis, which requires complete rest. United States v. Godfrey (C. C. A.) 47 F.(2d) 126; United States v. Sligh (C. C. A.) 31 F.(2d) 735, 737. There is

no evidence that work was injurious to the plaintiff; in fact, plaintiff testified his doctor advised him to lay around three or four days and then go to work.

Courts do take notice of medical evidence that very often tuberculosis, in its early stages at least, is curable. Hirt v. United States (C. C. A.) 56 F.(2d) 80, 82; United States v. Quimby (C. C. A.) 51 F.(2d) 167, 172. In the light of these cases, the diarrhea and nervousness at discharge established no evidence whatever of physical and/or mental condition of total and permanent disability, and from the employment of plaintiff at substantial wages for more than three years, or practically all of the time, except ten or twelve months he "managed the farm" and did odd jobs for his neighbors.

The physical facts positively contradict the statements of conclusion of the witnesses, and must control. The court may not disregard them. American Car & Foundry Co. v. Kindermann (C. C. A.) 216 F. 499, 502; Missouri, K. & T. R. Co. v. Collier (C. C. A.) 157 F. 347, certiorari denied 209 U. S. 545, 28 S. Ct. 571, 52 L. Ed. 920. Judgments should not stand upon statements or conclusions that are not predicated upon facts. Woolworth Co. v. Davis (C. C. A.) 41 F.(2d) 342, 347. The policy is a civil contract. No liability obtains until the conditions are broken, and until broken conditions are proven by a fair preponderance of evidence, no basis for recovery exists. The policy is not against nonemployment or against pain and discomfort in the stomach three or four hours after meals, which disappears when food is taken. United States v. Fly (C. C. A.) 58 F.(2d) 217, has clearly application. See, also, United States v. Rice (C. C. A.) 47 F. (2d) 749; Nalbantian v. United States (C. C. A.) 54 F.(2d) 63; United States v. Harrison (C. C. A.) 49 F.(2d) 227. The court is not concerned with the present condition of the appellee, except as it relates to total and permanent disability at the date of discharge, and at all times since that date, and the disability must have had its origin at or prior to the date of discharge, be total, and reasonably certain to be permanent during lifetime. And there is no substantial evidence in support of this fact. See, also, United States v. Le Duc (C. C. A.) 48 F.(2d) 789.

What was said by this court in United States v. Kerr, 61 F.(2d) 800, this day decided, is considered, and is applicable here.

Reversed and remanded.

Zach Lamar Cobb and Earl A. Littlejohns, both of Los Angeles, Cal., and A. Warner Parker, of Washington, D. C., for appellant.

Samuel W. McNabb, U. S. Atty., and Clyde Thomas, Asst. U. S. Atty., both of Los Angeles, Cal.

*Rehearing denied January 9, 1933.