**SMITH v. UNITED STATES.**
**No. 63.**

District Court, E. D. Kentucky, at Lexington.
Nov. 8, 1933.

ANDREW M. J. COCHRAN, District Judge.

This action is before me for judgment. It is a war risk insurance case; a jury has been waived, and I have heard the evidence. The plaintiff was the mother of the veteran, who died March 14, 1923, and was the beneficiary in the policy. He enlisted May 29, 1918, and was discharged August 5, 1919. He ceased to pay premiums after that day, and, unless it had then matured, it lapsed shortly thereafter. The claim of the plaintiff is that it had then matured, in that the veteran was then totally and permanently disabled. This she claims was due to the fact that he was then afflicted with pulmonary tuberculosis. The plaintiff might have brought this action when it matured, or, if uncertainty as to the permanency of the disease was such as to justify a delay without payment of premium, upon his death. This she did not do. She did not bring it until July 26, 1930. It is therefore a belated claim. This makes the burden which is on her to establish such disability by a preponderance of the evidence heavier than it would have been had she brought it promptly. It should be taken that she knew that the policy provided for the payment of $10,000 in case her son became totally and permanently disabled as well as of his death. Such is the very first provision in it. That no claim was asserted under it for so long a time can hardly be accounted for save on the ground that she did not consider that he had been totally and permanently disabled.

In the case of Eggen v. United States (C. C. A.) 58 F.(2d) 616, 618, it was said: "In most cases the insureds lapsed their policies when they left the service in 1919. They did not consider themselves then totally and permanently disabled. If they had, they would have made claims under their policies, and, if

there had been any substantial doubt in their minds as to whether they were not so disabled, they would have paid premiums in order to avoid any controversy over their right to collect upon the policies."

In the case of United States v. Linkhart (C. C. A.) 64 F.(2d) 747, 748, it was said: "While under the successive statutes enlarging the time wherein such actions may be brought the long delay does not of itself bar the action, it is a fact to be considered with all the other facts in determining, even upon appeal, whether there is substantial evidence to support the claim."

In the case of Keelen v. United States (C. C. A.) 65 F.(2d) 513, it was said: "This suit was brought on August 31, 1929, more than ten years after plaintiff's discharge from the service. During these ten years plaintiff neither paid premiums on his policy nor asserted claim under it. Under these circumstances plaintiff was under a heavy burden to 'show, by evidence contemporaneous with the life of the policy, the then totality and permanence of his disability as a fact existing and accepted, or * * * conditions then existing which, read in their own light and in the light of subsequent events, make it reasonably probable that, though then unclaimed and unrecognized, total and permanent disability did then in fact exist.' Wise v. U. S. (C. C. A.) 63 F.(2d) 307, 308."

Before coming to the case in hand, note should be taken of the positions which have been established as to the right of recovery in pulmonary tuberculosis cases. The leading case is that of Nicolay v. United States (C. C. A.) 51 F.(2d) 170, 173, a decision of the appellate court for the Tenth circuit. It paved the way for a correct and easy handling of such cases. It has been followed in these subsequent tuberculosis cases, to wit, Nalbantian v. United States (C. C. A.) 54 F.(2d) 63; Hirt v. United States (C. C. A.) 56 F.(2d) 80, 82; Roberts v. United States (C. C. A.) 57 F.(2d) 514, 515; Eggen v. United States (C. C. A.) 58 F.(2d) 616, 620; Long v. United States (C. C. A.) 59 F.(2d) 602; United States v. Rentfrow (C. C. A.) 60 F.(2d) 488; United States v. McCreary (C. C. A.) 61 F.(2d) 804, 808; Garrison v. United States (C. C. A.) 62 F.(2d) 41, 42; United States v. Diehl (C. C. A.) 62 F.(2d) 343, 345; United States v. Rosborough (C. C. A.) 62 F.(2d) 348; United States v. Peters (C. C. A.) 62 F.(2d) 977; United States v. Stack (C. C. A.) 62 F.(2d) 1056; United States v. Thompson (C. C. A.) 63 F.(2d) 111; Andrews v. United States (C. C. A.) 63 F.(2d) 184, 187; Walters v. United States (C. C. A.) 63 F.(2d) 299, 301; Mason v. United States (C. C. A.) 63 F.(2d) 791, 793; United States v. Hodson (C. C. A.) 64 F.(2d) 119; United States v. Perkins (C. C. A.) 64 F.(2d) 243; United States v. Thomas (C. C. A.) 64 F.(2d) 245; United States v. Bass (C. C. A.) 64 F.(2d) 467; United States v. Howard (C. C. A.) 64 F.(2d) 533; United States v. Dunaway (C. C. A.) 64 F.(2d) 535; United States v. Linkhart (C. C. A.) 64 F.(2d) 747; Bailey v. United States (C. C. A.) 64 F.(2d) 779; Falbo v. United States (C. C. A.) 64 F.(2d) 948; McCleary v. United States (C. C. A.) 64 F.(2d) 1016; Meyer v. United States (C. C. A.) 65 F.(2d) 509; Le Blanc v. United States (C. C. A.) 65 F.(2d) 514; United States v. Jones (C. C. A.) 65 F.(2d) 652; Combs v. United States (C. C. A.) 65 F.(2d) 787. In disposing of a tuberculosis case, one need not take into consideration any other of such cases, of which there are not many. It will be well if he does not. These cases all come from appellate courts. They impress one with the difficulty of making out the right to recover in a tuberculosis case. Their number is thirty-one. The plaintiff succeeded in only three of them, to wit, United States v. Thomas (C. C. A.) 64 F.(2d) 245; United States v. Bass (C. C. A.) 64 F.(2d) 467; United States v. Jones (C. C. A.) 65 F.(2d) 652. In each of these cases there was a trial before a jury, the jury found a verdict for the plaintiff, judgment for him was entered therein, and on appeal it was held that the case was properly submitted to the jury. There was no holding in either case that the plaintiff was entitled to recover. In the other twenty-eight cases the defendant succeeded. In two of them, to wit, United States v. Rentfrow (C. C. A.) 60 F.(2d) 488, 489, Combs v. United States (C. C. A.) 65 F.(2d) 787, the trial was by the court. In the other twenty-six the trial was before a jury, and in each of them it was held either that a directed verdict should have been given or that it was properly given.

■ I gather from these cases that, where the veteran at the time of his discharge is afflicted with active pulmonary tuberculosis, it is not hard to make out a case of total disability. The difficulty lies in making out that the disability is permanent. This is so because in such cases, usually, if not invariably, the disease is in its incipient stage, and whilst it is in such stage it may be cured. It is a matter of common knowledge that such is the case. In the Nicolay Case it was said: "We

have at best an insured in the early stages of tuberculosis. It is a matter of common knowledge that many such incipient tuberculars respond readily to the simple treatment of rest and nourishment; the activity is arrested, and, while there probably always will be a susceptibility of recurrence, they are able to, and do, live out their lives following gainful occupations. On the other hand, there are some that do not respond to treatment, and their condition is incurable from the start. The burden of proof is upon the plaintiff; if his evidence leaves it a mere matter of speculation as to the permanence of his condition in May, 1919, he cannot recover."

In the Hirt Case it was said: "We take notice of the medical fact that very often tuberculosis, in its early stages, at least, is curable."

In the Roberts Case it was said: "In the light of modern medical science it is well known that the disease of tuberculosis may with care and attention be brought to an arrested state, and it is likewise well known that when the disease is properly treated that a person suffering from it may respond and be able to carry on in a variety of different vocations of a substantially gainful nature."

In the Eggen Case it was said: "Courts recognize the fact that tuberculosis in its incipient stage is usually not an incurable malady."

In the Rentfrow Case it was said: "An incipient tubercular stands at a cross roads: If he continues his ordinary activities, his condition is a hopeless one. On the other hand, if he will follow a program of complete rest and wholesome nourishment for an indicated period, the chances are strongly in favor of an arrested condition and a substantial cure."

In the McCreary Case it was said: "Courts do take notice of medical evidence that very often tuberculosis, in its early stages at least, is curable."

In the Garrison Case it was said: "As has been pointed out in a number of recent cases, the mere fact that a man has tuberculosis does not necessarily mean that he is totally and permanently disabled. The tuberculosis may not result in total disability, and, even if it have this result temporarily, unless the condition is such as to preclude the possibility of arresting the disease, it cannot be said that the disability is permanent."

In the Andrews Case, it was said: "Incipient tuberculosis does not necessarily render one totally disabled. While active pulmonary tuberculosis generally amounts to total disability, and incipient may, it is a matter of common knowledge that incipient tuberculosis can be arrested, and in itself is not destructive of the ability to continuously pursue some gainful occupation."

In the Walters Case, it was said: "We may take notice as a matter pertaining to public health that today it is generally considered that many cases of tuberculosis in the earlier stages may be cured by proper treatment."

In the Mason Case, it was said: "At the worst he was in the early stages of tuberculosis. This is often curable, and need not incapacitate permanently from the performance of outdoor work."

It is apparent from these quotations that what is meant when it is said that tuberculosis is curable is that it is capable of being arrested. When the disease is arrested, the subject is substantially cured. His condition is such that he can carry on continuously substantially gainful occupations without detriment to his health. The significance of the Nicolay Case lies in the fact that there for the first time such curability was recognized. The last of the tuberculosis cases before such recognition is that of McNally v. United States (C. C. A.) 52 F.(2d) 440, where the right to recover was upheld. Though decided shortly after the Nicolay Case, the attention of the court was not called to it. There were cited therein the following previous tuberculosis cases, to wit: Mulivrana v. United States (C. C. A.) 41 F.(2d) 734; Malavski v. United States (C. C. A.) 43 F.(2d) 974; United States v. Meserve (C. C. A.) 44 F.(2d) 549; United States v. Phillips (C. C. A.) 44 F.(2d) 689.

Whether the recognition of such fact would have made any difference in these decisions I have not considered. In that earlier day I stumbled in the case of Humble v. United States (D. C.) 49 F.(2d) 600. Note of this was taken in the Rentfrow Case, where it was said: "We are cited to Humble v. United States, 49 F.(2d) 600, 601, where the District Court allowed a recovery because it was 'impossible to say that the disease would not continue active for the rest of his life.' But the burden of proof is upon the plaintiff to prove that the disability was permanent, that is, 'founded upon conditions which render it reasonably certain that it will continue throughout the life of the person suffering from it.' This burden is not carried by leaving the matter in the realm of speculation."

■ Due to this fundamental conception, the plaintiff does not make a case entitling him to recover by establishing that, at the time of his discharge, he was afflicted with tuberculosis in its incipient or early stage. In each of the twenty-six cases where it was held that it was not for the jury, recovery was denied notwithstanding it was established that the plaintiff was so afflicted. That the plaintiff was so afflicted does not necessarily make out that he was then totally disabled. It may, however, be of such extent as to so establish. It usually is. But it is hardly possible for it to be of such extent as then to establish that the disability is permanent. In order to do this, it must be established that it is incurable. Usually, if not invariably, reliance has to be had on the subsequent course of the disease to establish that at the time of the discharge it was incurable and hence permanent. It is possible that such subsequent course may so establish. In the Nicolay Case it was said: "The question is not, however, his present condition; the question is, What was his physical condition on or before May 2, 1919? Evidence as to his condition since is pertinent, but only as it bears upon his condition while his policy was in force."

In the Eggen Case it was said: "In the case of a total disability resulting from incipient tuberculosis before lapse, and ending in death or permanent disability after lapse, the subsequent history might disclose the existence of conditions during the life of the policy not then known or recognized, which would justify a conclusion that it had been reasonably certain while the policy was in force that the disability would continue throughout life."

And again: "The subsequent events may be such in point of time or circumstance as to constitute evidence of the conditions upon which the disability existing during the life of the policy was based, but they are of no importance unless they do constitute such evidence, because they do not of themselves condition the right of recovery under the policy, which must depend entirely upon the conditions which existed when the policy was alive."

In the Diehl Case it was said: "Of course, the subsequent history of the insured may be considered for the purpose of determining whether a disability deemed only partial or temporary at the time of the lapse of the policy was in fact total and permanent. But partial disability existing at the time of lapse does not warrant a recovery, even though total disability may subsequently result; and total disability based upon conditions which at the time of lapse do not render it reasonably certain that such total disability will continue through life is not to be deemed permanent, even though a subsequent change of conditions may render such disability permanent in character."

In the Jones Case it was said: "What happens to-morrow may throw a white light on what exists to-day."

■ But that death or a permanent disability subsequently happens from the disease does not in and of itself establish that the disability was at the time of the discharge permanent. In the Eggen, Rentfrow, Peters, and Stack Cases, before the action was brought, the veteran died of the tuberculosis with which he was afflicted at the time of his discharge and yet recovery was denied. In the Peters Case the policy lapsed August 31, 1919, and he died April 11, 1922. In the Hirt Case it was conceded that the plaintiff, who was discharged April 20, 1919, was totally and permanently disabled November 20, 1922, and yet recovery was denied. That it becomes evident subsequently that the disability is permanent and that the disease is incurable does not necessarily establish that such condition existed at the time of the discharge arises from the fact that such result may have been due to neglect or refusal to take proper treatment. If it affirmatively appears that he did so neglect or refuse, it is clear that there can be no recovery. In the Eggen Case, referring to the case in hand, it was said: "No one could determine from the evidence whether there were, during the life of the policy, conditions not disclosed which then placed the insured in the class of incipient tuberculars who cannot be cured, or whether, subsequent to lapse, such conditions developed during the natural progress of the disease, or because of the failure of the insured to take treatment, or as the combined result of both the disease and such failure. The appellant calls attention to the fact that there was nothing in the contract requiring the insured to take treatment. That is true, but an insured may not convert a total temporary disability existing before lapse into a total permanent disability by neglecting his condition after lapse, and the failure to take treatment may destroy whatever probative value death or permanency of disability occurring after lapse would otherwise have."

In the case of Wise v. United States (C. C. A.) 63 F. (2d) 307, 308, which was not a tuberculosis case, it was said: "It is undisputed that the condition of his shoulder and

ankle could have been remedied by a comparatively minor operation. It certainly cannot be said that an injury which in its nature is alleviable by proper treatment is permanent, because many years afterward, no such treatment having been given, it still persists."

In the Walters Case it was said: "It is evident that, when appellant was discharged from the army, his tuberculosis was in the earlier stages. He was afforded every opportunity to receive adequate treatment without expense in government hospitals. While he frequently took advantage of such treatment, he always left these hospitals of his own accord, against medical advice. It was his duty to remain until cured or discharged as incurable."

█ Such neglect or refusal makes it so that it cannot be said that the disease was incurable and the disability was permanent at the time of the discharge, for the incurability or permanency which subsequently becomes evident may be due to such neglect or refusal and not to the fact that the disease was then incurable. This suggests that the plaintiff, to sustain his burden by showing that subsequent events make evident the incurability of the disease, must also show affirmatively that he had undergone proper treatment. Otherwise it cannot be said that such condition existed at the time of the discharge. It also suggests that though subsequent working because of economic conditions but such as to affect harmfully his physical condition does not show that he was not totally disabled at the time of the discharge, as has been held, may render it impossible to say that he was then permanently disabled, i. e., that his disease was then incurable. The incurability subsequently manifesting itself may be due to such working, which involved the failure to undergo proper treatment, i. e., complete rest. Nothing is to be gathered from any of the tuberculosis cases hereinbefore referred to bearing on either of these matters. It is to be noted that in most, if not all, of the twenty-six cases where it was held that no issue was presented for the jury and the defendant was entitled to a directed verdict, there was a work record which negatived total disability at the time of the discharge. In a case where there is no work record it may be a question how far they have a bearing upon it. There is a work record in this case, but its disposition does not depend on it. Hence I do not find it necessary to go into that question here. Nor is it necessary to consider the three cases in which it was held that there was an issue for the jury. Even if they are

authority for the position that, if this case were before a jury, apart from a certain feature of it, it should be submitted to it, that feature would in and of itself require a directed verdict.

This brings me to the case in hand. I would first present a skeleton of it. The veteran enlisted May 29, 1918, and was discharged August 5, 1919. He was discharged at Camp Taylor near Louisville, Ky., and returned that evening to his home with plaintiff in Henry county in this district. He remained there until April or May, 1920, when he went to Indianapolis, Ind. On May 3, 1920, he entered into the employ of Kingan & Co., meat packers at that place, as meat cutter or butcher, and remained in their service until May 6, 1921. On October 23, 1920, whilst so employed, he married. He spent a few days before his marriage with the plaintiff at her home. On February 21, 22, 23, 24, and 28 he was examined by Dr. J. William Hoffman, acting assistant surgeon at the Veterans' Bureau's headquarters in that city and four different specialists. On May 9, 1921, he entered the Methodist Hospital at Indianapolis and remained there until June 2, 1921. On leaving there he returned to plaintiff's home. He remained there until August 17, when he went to the Hazlewood Sanitarium, a hospital for tuberculars at Louisville, Ky. On July 13, 1921, before going there, he was examined at Louisville, Ky., on behalf of the Veterans' Bureau by Drs. L. P. Spears and E. McD. Trabue. On August 15, 1921, also before going there, Dr. J. C. Hartman, a local physician, who had treated him after his return from the army, made to the Veterans' Bureau a written statement regarding such treatment. On August 31, 1921, the hospital made a report regarding his condition. On September 19, 1921, the Veterans' Bureau requested of Dr. J. C. Hartman certain information as to Smith, and shortly thereafter he gave it. On September 30, 1921, the hospital made another report as to his condition. On November 30, 1921, it made another such report. He left the hospital in December, 1921. Dr. S. W. Bates, medical director and superintendent, made a report to the Veterans' Bureau December 17, 1921, concerning his leaving. Some time after this he went to Asheville, N. C., with a view of entering a government hospital, but only stayed a week, as he could not stand the air. On March 10, 1922, he was examined at Louisville, Ky., by Drs. L. P. Spears and J. I. Taylor on behalf of the Veterans' Bureau. On December 6, 1922, he was examined again by Drs. R. C. Adams and E. McD. Trabue

on behalf of that Bureau. He died March 14, 1923.

██ This skeleton should now be filled out with facts as to which there can be no question. When he entered the army he was in good health and weighed 137 pounds. Whilst he was there nothing happened to him to impair his health. This does not appear affirmatively. In the absence of evidence to the contrary, it is to be taken that such was the case. On his discharge he answered "No" to the question as to whether he had any reason to believe that at that time he was suffering from the effects of any wound, injury or disease or had any disability or impairment of health, and his captain certified at the same time that he did not know nor did he have any reason to believe that he had a wound, injury, or disease at that time. In his statement of August 15, 1921, Dr. Hartman said that Smith called at his office August 20, 1919, for medical attention, that he was at that time suffering with gastric symptoms and bronchitis, for which he received treatment, and that he treated him at intervals for this trouble until April 10, 1920, at which time he passed from under his observation. In his statement in response to the request from the Veterans' Bureau of September 19, 1921, he said that he first treated him at intervals between August 20, 1919, to April 18, 1920, and that at that time he had gastric symptoms and bronchitis. After entering the employment of Kingan & Co. on May 3, 1920, he worked continuously every weekday until October 8, 1920, except on Decoration Day, 4th of July, and Labor Day, which were holidays, and August 2, 1920. The one day which he missed during that time outside of holidays when the establishment was not operating, was August 2, 1920. Each day he worked it was for at least 8 hours, except on October 7th and 8th, and on most of the Saturdays, when he worked 5 hours. Three days he worked 9½ hours, one day 10¼ hours, thirty-one days 11 hours, one day 12½ hours, and two days 15½ hours. He did not work from October 9 to October 20, 1920. This was just before his marriage on October 23d, when he visited the plaintiff at her home in Henry county. From October 21, 1920 to April 13, 1921, he worked every day except on Thanksgiving Day, Christmas and January 1st, holidays, and on November 2d, 5th, December 4th, 23d, 28th, January 27th, February 3d, 7th, 8th, 17th, and March 26th. In this nearly six months' time outside of holidays he missed eleven days. Except on Saturdays and December 20th, January 4th, February 9th and 10th, 15th and 16th, and March 29th, he worked at least 8 hours a day. On Saturdays he usually worked 5 hours a day, but often 8 hours. On the other excepted days he worked 7 hours. He did not work from April 13 to April 25, 1921, and worked again from April 26 to May 7, 1921, 8 hours a day except three days at 5 hours. He was paid for his services 54¾, 57, 58, and 50 cents an hour, usually 58 cents. It is likely that the examination by Dr. Hoffman and the four specialists in the latter part of February, 1921, at Indianapolis on behalf of the Veterans' Bureau was brought about by the veteran's application for compensation. He never had received compensation or applied for it before this time. His complaint was sore eyes, vertigo, deafness, rheumatism, and internal hemorrhoids. Dr. Hoffman reported that he weighed 138 pounds, one pound more than when he entered the army; that he was only fairly well developed and nourished and somewhat sallow in appearance. His diagnosis was internal hemorrhoids and chronic otitis media, and his prognosis was fair. He said nothing about his complaining of or being afflicted with tuberculosis. The specialists who examined and reported as to his condition were such in hemorrhoids, eyes, ears, and tuberculosis. The hemorrhoids specialist reported that his complaint was eyes, ears, rheumatism, and piles; that his past history was negative; that he stated that during May, 1919, while doing heavy work, he noticed pain and protrusion from rectum, which prolapse was then occurring two or three times a month. His diagnosis was internal hemorrhoids. He recommended that he receive hospitalization and operation treatment and that he be examined by the tuberculosis specialist. The eye specialist reported that he claimed that his left eye bothered him more than the right; that sometimes there was a mist over the left eye and it also jumped. His diagnosis was hypermetropia and prognosis good. The ear specialist reported that he claimed that in April, 1919, he had abscess form in head with discharge from nose and ears, that he had dizziness at times, and that he had attacks of rheumatism at different times affecting shoulders and hips. His diagnosis was otitis media chronic and prognosis favorable. The tuberculosis specialist reported that he complained of pains in left lung and through shoulders; that he coughed at night and was short of breath; that he had abscess in head and ears in France in April, 1919; and that he had not been well since then. He reported further that he did not look well, was not well developed or nour-

ished; that he had long broad flat chest depressions above and below both clavicles, one at ensiform cartilage; that his mobility was fair; that he had hyperresonance and feeble breathing over entire chest; and that he heard no râles. His diagnosis was emphysema, aggravated by military service, and that his prognosis was not good for cure. He recommended easy work and right living. These examinations by the Veterans' Bureau were thoroughgoing. They found no trace of tuberculosis, and there was no complaint thereof on the part of the veteran.

He was admitted to the Methodist Hospital at Indianapolis May 9, 1921, with the diagnosis of internal hemorrhoids and otitis media made in latter part of the previous February by the Veterans' Bureau, and on May 25, 1921, he was treated with hemorrhoidectomy, and the result thereof was that he recovered from hemorrhoids. Whilst in the hospital he was examined by their tuberculosis specialist. His diagnosis was tuberculosis chronic, pulmonary, both upper lobes, right apparently arrested and left upper lobe active. His prognosis was fair with treatment. He recommended hospitalization. The physician in charge of the hospital reported his pulmonary condition as fair and disability major temporary. He recommended treatment at a tuberculosis sanatorium, and stated that the veteran would accept, preferred to be sent to Johnson City, Tenn., or Oteen, N. C., was able to travel alone any distance, and in one month from the date of his discharge June 2, 1921, would be ready to leave for the sanatorium. These facts were certified to the Veterans' Bureau at Indianapolis by the physician before referred to on June 2, 1921. This is the first indication of the veteran suffering from tuberculosis apart from plaintiff's testimony yet to be stated.

The report of Drs. Spears and Trabue of their examination of the veteran on July 12, 1921, gave their diagnosis as chronic pulmonary tuberculosis, active and advanced, and their prognosis was grave. The report of the Hazlewood Hospital on August 31, 1921, stated its diagnosis was chronic pulmonary tuberculosis, and his weight on admission and at the time of the report was 121 pounds. The report on November 30, 1921, stated its diagnosis was chronic pulmonary tuberculosis, that he was improved and general progress was good, and his then weight was 129 pounds. The report of Dr. Bates, medical director and superintendent of the Hazlewood Sanitarium, of December 17, 1921, after he left it, stated the circumstances thereof. He said: "About a week ago he left the institution with our permission upon receiving a telephone message saying his wife was seriously ill in Indianapolis, but we are reliably informed he spent the next few days in a questionable hotel in this city on a drinking expedition. He was advised that unless he returned at once he would be discharged. He did return yesterday during my absence, and said he was unable to remain at this time owing to the illness of his wife. This man has an active pulmonary tuberculosis and is badly in need of treatment."

The testimony of the veteran's wife accorded with this report in its statement that he voluntarily left the hospital. She said that "he wouldn't stay there." Drs. Spears and Taylor in their report of their examination of the veteran on March 10, 1922, at Louisville stated their diagnosis to have been "chronic pulmonary tuberculosis, active and prognosis very poor." They stated that they advised hospital care and that the veteran would not accept it. The report of the final examination on behalf of the Veterans' Bureau December 6, 1922, by Dr. Adams and Trabue stated their diagnosis as "tuberculosis active advanced and prognosis poor." They stated that they advised hospital care, and that the veteran was willing to accept it.

As stated, these facts have to be accepted as true. There was no evidence offered by plaintiff in contradiction of any of them. According to them, no physician diagnosed the veteran as being afflicted with tuberculosis prior to his confinement in the Methodist Hospital at Indianapolis. The diagnosis of Dr. Hartman, the local physician, was "gastric symptoms and chronic bronchitis." That of the Veterans' Bureau and its specialists in Indianapolis in the latter part of February, 1921, was "internal hemorrhoids, otitis media and emphysema." They found no trace of tuberculosis, and the veteran did not claim that he was so afflicted. Dr. Hoffman, however, conceded that he might then have had a mild case of incipient tuberculosis. Thus it was, according to these facts, nearly two years elapsed before tuberculosis made its appearance. That such was the case bears heavily against the veteran's having been afflicted at all with tuberculosis at the time of his discharge. The work record with Kingan & Co. is to the same effect. These circumstances certainly make a very strong case against his being then so afflicted as to be rendered totally and permanently disabled.

This brings me to a consideration of the evidence tending to show that he was afflicted

with tuberculosis at the time of his discharge and that the affliction was of such a character as to render him totally and permanently disabled. Eleven witnesses testified on behalf of plaintiff. Seven of them were relatives, the plaintiff, the mother, three sisters, a brother-in-law, an uncle, a Miss Hays, who had lived with plaintiff for nearly twenty-two years, a neighbor, Dr. Hartman, the widow, and two acquaintances in Indianapolis. All but the widow and the two Indianapolis acquaintances testified as to his looking badly on his return from the army as compared with his looks before he entered it. The plaintiff testified that on the evening after he returned, whilst he was eating at dinner, he had to leave the table on account of a very bad hemorrhage; that thereafter whilst he was at home before he went to Indianapolis in April or May, 1920, he had hemorrhages frequently, especially if he tried to do any work; that he had night sweats, nightclothes would be wet, almost wringing wet; that he coughed very hard, had coughed continuously though he did not cough all the time after he came home until he died; that along in October he seemed to be a little better, but got worse in December and January; that his digestion was very bad, hardly ever retained his food, appetite varied, not regular, sometimes would not eat anything and then have appetite to eat; that when he came home in October just before his marriage he had lost weight, was coughing incessantly, could hardly draw breath without coughing; that on his return from Indianapolis on June, 1921, he was very thin and weak and could not walk up to his home; and that his condition did not improve whilst he was at Hazlewood Sanitarium. The three sisters, the brother-in-law and uncle testified substantially to the same effect, though that of the uncle was not so strong. Miss Hays testified as to the hemorrhage the day he returned home. The neighbor testified to the veteran's changed looks and his inability to work. Dr. Hartman testified that he first saw the veteran on August 7th at plaintiff's home; that he was called there by her and he had some temperature and some harsh râles; that he saw him again the latter part of August when he had some râles through his chest, temperature, expectoration, and a cough and had been vomiting; that he treated him until spring of 1920; that his diagnosis was bronchitis and gastritis; that he saw him in June, 1921, after his return from Indianapolis, when he had hemorrhages and evening temperature and mucus or moist râles; and that from the time he first

examined him he was not able to follow continuously a substantially gainful occupation. The widow testified that whilst working at Kingan's he would come in at night so tired that he could not eat; that he lived mostly on eggs and milk; that he had night sweats and his bed was wet in the morning; he wore two sets of pajamas at night so he could change during the night; that he was not at work a part of the time, some days would not go until noon and some days come at noon, and did not work after the first of the year 1921; that he coughed and spit all the time and expectorated yellow mucus; that he lost 30 pounds whilst in Methodist Hospital, was losing weight all the time; and that whilst he was at Hazlewood he was getting weaker. The two Indianapolis acquaintances testified that he appeared in a very much run-down condition, was very pale then and coughing, had a bad color, seemed to gradually grow weaker and thinner, and that he did not work regularly.

█ Such then is the testimony on which plaintiff relies to make out that her son, the veteran, was afflicted with tuberculosis at the time of his discharge and that it was of such a character as to render him totally and permanently disabled. It is not an easy matter to accept it as presenting a true picture of the veteran's physical condition before it was discovered at the Methodist Hospital in May, 1921, that he was afflicted with tuberculosis in the face of the facts stated, which must be accepted as true. There is no medical testimony that he had tuberculosis at the time of his discharge or that it was such as to disable him to the required extent. Dr. Hartman's testimony is in conflict with his statement on August 15 and September 19, 1921, when things were fresher in his mind. He there states that the first time he saw the veteran was on August 20, 1920, when he called at his office. This is in conflict with his testimony that he saw him on August 7th at plaintiff's home. Then his statement that on August 7th he had temperature and some harsh râles and the latter part of August he had some râles through his chest, temperature, expectoration, and a cough is hardly reconcilable with his diagnosis of chronic bronchitis. So the testimony of the widow as to his work at Kingan's is in conflict with its record in regard thereto. It is hard to conceive of him being allowed to act as meat cutter or butcher if he was coughing, spitting, and expectorating yellow mucus. If put to it, I might be constrained to hold that plaintiff has not sustained the

burden on her to establish by a preponderance of the evidence that the veteran was suffering from tuberculosis at the time of his discharge and that it was such as then to totally and permanently disable him. The necessities of this case do not require that I go that far. She is not entitled to recover because of his leaving Hazlewood Hospital against the advice of its medical director and superintendent, as to which there can be no question. That such was the case is shown by Dr. Bates' report and the testimony of the widow. When he did so, he was improving. This is shown by the report of November 30, 1921. That report states that his symptoms were improved and the progress good, and what is more to the point that he was gaining in weight. He then weighed 129 pounds or 8 pounds more than he weighed on August 17, 1921, when he entered the hospital. Then again on March 10, 1922, he was advised by the physician of the Veterans' Bureau to accept hospital care, and he was unwilling to do so.

I am therefore constrained to dismiss the petition.