## ACOSTA v. UNITED STATES.
### No. 3022.

Circuit Court of Appeals, First Circuit.
Jan. 7, 1936.

MORTON, Circuit Judge, dissenting.

———◆———

Warren E. Miller, of Washington, D. C., and F. B. Fornaris, of Ponce, P. R., for appellant.

Cecil Snyder, U. S. Atty., of San Juan, P. R. (Will G. Beardslee, Wilbur C. Pickett, Randolph C. Shaw, and Thomas E. Walsh, all of Washington, D. C., on the brief), for the United States.

Before BINGHAM and MORTON, Circuit Judges, and MORRIS, District Judge.

BINGHAM, Circuit Judge.

Sixta Acosta brought an action in the United States District Court for Puerto Rico to recover on a war insurance contract the monthly installments alleged to be due her, as administratrix of Pablo Rivera's estate, from the date of his discharge from the Army, December 26, 1918, to the date of his death, April 16, 1922, and as beneficiary thereafter.

The policy of insurance was in force up to January 31, 1919, before which time the plaintiff claims that Pablo Rivera, her husband and the insured, became totally and permanently disabled, as he then had pulmonary tuberculosis from which he never recovered.

The two issues raised by the pleadings and tried by the jury were (1) whether Pablo Rivera was totally disabled January 31, 1919, the date of the expiration of the insurance contract, and (2) whether, if so, it was a permanent disability.

As to the first question there was evidence from which the jury might have found that Rivera was, at the time of his discharge from the Army, December 26, 1918, and before his insurance lapsed (January 31, 1919), suffering from tuberculosis and by reason thereof was totally disabled. The District Court directed a verdict for the defendant on the ground that the plaintiff had failed to sustain the burden of showing that Rivera had "used reasonable precautions and procured reasonable treatment" to effect a cure, and this appeal was taken from the judgment entered on the verdict.

The evidence shows that on returning home from camp Rivera was sick, had a temperature, night sweats, pain in his chest, a bad cough, and expectorated much; that he went to bed and had a doctor; that he was examined by Dr. Soltero and thereafter remained at home for a time taking medicine; that Mr. Santiago, under whom he later worked, off and on, as a timekeeper, sent him at various times to Dr. Soltero for treatment; that in 1920 he had hemorrhages, emitting blood from the mouth; that he worked intermittently as timekeeper during a portion of the six months crop season of 1919 and 1920, but not more than three months in all, because he would work for two or three days only during the week and sometimes would be a whole week without working, and, when he did work, it was for only a few hours each day; that the second week after coming from camp while at work he fainted and was taken home; that three days before his death, April 16, 1922, Dr. Soltero visited him for the last time; that before he entered the Army he was a strong, robust man; that after he returned from the Army he lived at home and was cared for by his wife, but continued to fail to the time of his death; that during all the time from Rivera's discharge to his death the disease was steadily progressing, notwithstanding the care and treatment he had and the little he did.

While Dr. Soltero, on being shown two certificates (signed and sworn to by him, stating that Rivera had been under his medical treatment from 1919 to November, 1921, the date of the certificates), testified that he must have treated him, he further testified that he did not, at the time of the trial, remember anything about the case, and the certificates were excluded.

A report of the United States Veteran's Bureau, dated November 28, 1921, signed by C. M. Fauntleroy, surgeon, district manager, included, among other things:

"7. Physical Examination.

"General appearance—fairly well developed.

"Weight 118 lbs.—Height 5 ft. 4¼ inches.

"Examination of eyes, ears, nose and throat—normal.

"Examination of chest.—

"Inspection—Barrel shaped. Clavicles prominent. Supra and infra clavicular spaces depressed. Diaphragmatic breathing.

"Palpation—

"Percussion—Impaired resonance to about third dorsal, left.

"Ausculation — Diminished breath sounds, left apex. Crackling rales heard after a cough over both apices.

"Examination of abdomen, genitalia, skin, upper and lower extremities—normal.

"Pulse—113 per minute. Temperature 9:30 a. m. normal.

"Respiration—34 per minute.

"Examination of sputum not made as he refused to stay for examination of same.

"8. Diagnosis: 1241—Tuberculosis, chronic pulmonary, (Active)

"9. Prognosis: Fair.

"10. Claimant is not able to resume former occupation.

"11. Do not advise resumption of former occupation.

"12. Claimant is not bed ridden.

"13. Claimant is able to travel.

"14. Hospital care not advised.

"15. * * *

"16. Origin of disability is unknown.

"17. Degree of vocational handicap resulting from the disability is one hundred percent.

"18. Physical and mental condition does not render training feasible."

Dr. Jose A. Amadeo, called as an expert on behalf of the plaintiff, after being shown the report of the Veterans' Bureau and asked hypothetical questions in which the history of Rivera's case was inserted, said:

"I regarded him as an active case of pulmonary tuberculosis since 1919. Now in the case of active pulmonary tuberculosis, in respect to the lesion, he is totally disabled for the time being because no matter how small the lesion, if the lesion is active, if the body is absorbing toxins from that lesion, any undue activity on the part of the patient is followed in the immense majority of cases with more activity in the lesion and with the spread of the lesion."

He further testified that the insured was permanently and totally disabled, and "there is no doubt that the lesion was permanent because it continued throughout the life of the insured"; that the insured had active tuberculosis in 1919, because he had the symptoms; that "from the history of this case the onset was acute"; and that "it has been stated that immediately on his return from the army he developed these symptoms."

He also testified:

"When the evidence is that the case has never got well, there is no question about the permanency, as I see it. In any hypothetical case when a man has the disease and does not get well, it is obvious that the lesion was permanent. I don't think there is any question.

"The Court: Might it not be that in a case which does not get well it is not because of lack of proper treatment? A. Yes, indeed.

"The Court: Would you say the disease is permanent purely because the person died from it, in the absence of any showing as to whether or not proper treatment was applied? A. Yes, because in any disease proper treatment does not guarantee a cure, even in case of diseases like syphilis; some never get well in spite of the best treatment. I know of a case of a boy in one of our best families, and in spite of the fact that he was treated by the best experts in the world he died. So the treatment does not absolutely guarantee the cure.

"The Court: Now turn it around. Failure to give proper treatment doesn't always result in death? A. No, indeed. Some rare cases do get well, whether with treatment or without treatment.

"The Court: Because of the power of resistance of the individual? A. Yes, sir. If you take a very incipient case of tuberculosis and you ask me then if that man is permanently disabled, I will say then, at that time, probably not. Many of these kind of cases with proper treatment do get well, but if you ask me at the end of five more years when the patient has since died, if that lesion was permanent, of course I have to say yes. The patient died of the same disease, whether he got treatment or no treatment."

On cross-examination he testified that he often cured cases of pulmonary tuberculosis.

"Q. What is the proper treatment in order to cure a case of pulmonary tuberculosis? A. That is a very wide question. Like everything in medicine, it is very hard to make general rules. Every case is a case by itself.

"Q. Well, rest is generally accepted as part of the cure for pulmonary tuberculosis, isn't it? A. Yes, sir.

"Q. And, doctor, if a person with active tuberculosis in its earlier stages takes proper treatment and rest and care, is it reasonably likely that he may recover? A. Well, it is probable that he may recover. You cannot state offhand that it is or is not reasonably likely. It is probable that he will.

"Q. Is it reasonably likely that he may not recover? A. Yes, that is true.

"Q. In other words, it is entirely speculative until he submits to that proper treatment of rest and care. A. Yes. In other words, some cases respond well to treatment and others do not.

"Q. And those cases in their earlier stages? A. Will respond to treatment."

As we have said, there was evidence from which the jury could have found total disability of the insured before the lapse of the policy. There was also evidence that the onset of the disease was acute, and permanent if not arrested or cured; and the only question remaining is whether on the evidence a jury could find that reasonable care was exercised for its arrest or cure. We think from what has been said that it could.

In United States v. Kane, 70 F.(2d) 396 (C.C.A.9), decided April 13, 1934, it was held that, "where evidence showed that insured had tuberculosis and was unable to carry on even light kinds of work continually and regularly, whether insured was totally and permanently disabled" was for the jury, and in United States v. Na-

tional Bank of Commerce, 73 F.(2d) 721, 725 (C.C.A.9), decided November 19, 1934, the court distinguished Falbo v. United States (C.C.A.) 64 F.(2d) 948, by saying:

"In that [case] there was no direct evidence that Falbo was suffering from tuberculosis until nearly a year after his discharge, and he had been working throughout that period."

Here the onset of the disease was acute and the insured at no time after his discharge worked continuously. On the contrary, he did but little work and that was intermittent, for a few days or even hours at any given time, and of a light character. He had medical care and treatment, and the care and attention of his wife, but he died of the disease.

The judgment of the United States District Court for Puerto Rico is vacated, the verdict set aside, and the case is remanded to that court for a new trial.

MORTON, Circuit Judge (dissenting).

In this case there was clearly disability total in character while the policy was in force. The real question is whether before the policy lapsed the disability was permanent; i. e., was the disability "reasonably certain to be permanent during lifetime." United States v. McCreary (C.C.A.) 61 F.(2d) 804, 808. "The burden of proof is on the plaintiff; 'it is not carried by leaving the matter in the realm of speculation.'" Falbo v. United States (C.C.A.) 64 F.(2d) 948, 949.

It appears to be judicially settled that tuberculosis in its early stages while it then creates a total disability does not create a permanent one. In other words, incipient tuberculosis is regarded as an acute illness in which the prognosis is favorable. This was the view taken in the Falbo Case above referred to which was affirmed by the Supreme Court, 290 U.S. 618, 54 S.Ct. 100, 78 L.Ed. 540, and in a number of other cases. In the Falbo Case the policy lapsed in May, 1919. The court said, "While, on this evidence, a finding of *total* disability in May, 1919, and of *permanent* disability at a much later period, would be justified, we concur in the judgment of the District Judge that it fails to show a condition of permanent disability in May, 1919, a disability then 'reasonably certain to be permanent during lifetime.'" (Italics supplied.) Mack, J. 64 F.(2d) 948, 949. Some of the questions put by the trial judge in this case to the plaintiff's witness appear to have been suggested by the questions in the Falbo Case. The evidence here on this point of permanence is certainly no stronger for the plaintiff than it was in the Falbo Case. As the Falbo Case was affirmed, I suppose we are clearly bound by it. I am unable to distinguish it. The general character of tuberculosis as a disease is a fact depending on medical testimony. United States v. Clapp, 63 F.(2d) 793, 795 (C.C.A.2). Opinions that the insured became permanently disabled before the policy lapsed "are without weight." United States v. Spaulding, 293 U.S. 498, 506, 55 S.Ct. 273, 79 L.Ed. 617.

Undoubtedly, the presumptively curable character of tuberculosis may in any given case be overthrown by evidence that in that case the disease refused to yield to treatment. But the evidence in this case does not, I think, warrant such a finding. The plaintiff's doctor testified: "I have never heard that he was properly treated. Ques. But if you will assume that he had been properly treated? Let us assume in a hypothetical case in which the symptoms would be exactly what they are here, assume that that man had taken proper treatment. Ans. Well, it is possible and probable. He has about a fifty-fifty chance to get well." Compare this evidence in the case before us with the evidence in the Falbo Case: "Ques. Is it reasonably likely he would not have (recovered)? Ans. Well, he may have recovered and he might not have." Both cases dealt with consumption.

In the latest expressions from the Supreme Court it has shown no disposition to relax the rule in the Lumbra (290 U.S. 551, 54 S.Ct. 272, 78 L.Ed. 492) and Falbo Cases that the plaintiff must introduce evidence that the disability was not only total but also permanent before the policy lapsed. See United States v. Spaulding, 293 U.S. 498, 55 S.Ct. 273, 79 L.Ed. 617; Miller v. United States, 294 U.S. 435, 55 S.Ct. 440, 79 L.Ed. 977.